WOODRUFF *v.* NORTH BLOOMFIELD GRAVEL MIN. Co. *et al.*

*(Circuit Court, N. D. California.  January 19, 1891.)*

CONTEMPT—VIOLATION OF INJUNCTION—EVIDENCE.

In proceedings for contempt for the alleged violation of a decree enjoining defendants from discharging into a certain stream any of the tailings, *débris*, or refuse matter from certain mines, complainant's witnesses testified that on a certain day defendants were conducting hydraulic mining operations; that the water used ran into a settling pool, and thence through a tunnel into the stream; that the water flowing into the settling pool was laden with *débris*; that the water in the tunnel, about 30 or 40 feet from its mouth, and two miles from the mines, was muddy; that witnesses heard large stones rolling along the bottom of the tunnel in the water. Defendant's evidence showed that all the *débris* from its mines was run into the settling pool, where the coarse material was all deposited, the pool having a dam which was kept higher than the water in the pool, and only the water freed from the *débris* flowed into the tunnel. It was not shown that the water flowing out of the settling pool was ever discolored, and it appeared that sand, gravel, rocks, and *débris* would find their way into the tunnel, irrespective of defendant's mining operations, from other sources. *Held*, that defendant was not guilty.

In Equity.  Contempt for violating injunction.  For former reports see 16 Fed. Rep. 25, and 18 Fed. Rep. 753.

*A. L. Rhodes* and *Alfred Barstow*, for complainant.

*C. W. Cross*, for respondents.

HAWLEY, J., *(orally.)*  On the 23d of January, A. D. 1884, a decree was entered in this court in favor of complainant, Woodruff, enjoining the defendants, the North Bloomfield Gravel Mining Company and others, "from discharging or dumping into the Yuba river, or into any of its forks or branches, including Humbug creek, any of the tailings, boulders, cobble-stones, gravel, sand, clay, *debris*, or refuse matter from any of the tracts of mineral lands or mines described in the complaint."

It is claimed that said corporation and L. L. Robinson, its president, on the 24th and 29th of February, 1888, violated said decree.  The case is brought before the court upon exceptions to the master's report, finding the defendant not guilty.  From the report of the master in chancery it appears that three witnesses, Boyd, Lee, and Stearnes, were examined upon the part of complainant, and testified, in substance, that on the days named they left Nevada City, and traveled on horseback to the vicinity of the North Bloomfield mine; that at a point distant about one-quarter of a mile from the mine they saw that hydraulic mining operations were being conducted in said mine; that two monitors were being used, piping on the north bank; that they could hear the roar of the monitors, and could see the spray of the water therefrom; that the water from the monitors, after it had spent its force against the bank, went into a sluice box, and ran down into a settling pool, and from thence into and through the tunnel into Humbug creek, and from said creek into the Yuba river; that the volume of the water was about 2,500 inches; that the water flowing into the settling pool was laden with *debris* to some extent, was of a yellowish color, and was muddy; that they went to the mouth of the tunnel, some two miles from where

v.45F.no.3—9

the mining operations were being carried on, and at a point about 30 or 40 feet from the mouth of the tunnel took samples of the water in bottles; that the water looked pretty dirty, and was muddy; that there were stones rolling along the bottom of the tunnel; that they could not see the stones, but could hear them making a grating noise, like stones will in rolling in water; that the size of the stones were judged by them to be about half as big as a man's head.     One of the witnesses (Lee) testified that on the 24th of February, the only day he visited the mine, he saw rocks going along at the mouth of the tunnel that would weigh 40 or 50 pounds, and that they were sufficient in quantity "to have filled' the canon in twenty minutes."     It is conceded by complainant's counsel that the testimony of this witness is, in this respect, absurd, and unworthy of belief, and they only claim that his testimony in other respects should be considered in so far as corroborated by other witnesses.

In order to fully understand the testimony of these witnesses, it is necessary to refer to the testimony given by L. L. Robinson on behalf of respondents, from which it more clearly appears that the mining operations were confined to a space of about 600 acres in extent, and entirely surrounded and inclosed by banks from 150 to 400 feet high; that the lower end of this space, to an area of 700 by 1,500 feet upon the bottom, was partitioned off from the remainder of the pit or space by a dam; that at the height of about 80 feet from the bed-rock was a large flume, extending from the mining operations nearly half a mile, to and over this dam, and into the pit; that the material mined above the level of this flume was carried by water and gravity into this flume and pit; that the material mined below the level of this flume was, by a great machine, known as an "hydraulic elevator," carried up and discharged into this flume, and thence into the impounding pit or reservoir; that the impounding reservoir had a bottom of the solid slate bed-rock; that three of its sides consisted of the natural banks of the creek, from 150 to 400 feet.high; that the other 'side consisted of a dam extending across the pit from wall to wall, some 400 feet in length; that this dam was kept all the time above the top of the water and *debris* in the impounding reservoir; that the tunnel through which the mine was formerly worked is nearly two miles in length, and extends through the mountain, and at a great depth under the bottom of the entire impounding reservoir, and is raised to the surface, with a deep cut above the upper end and dam of the impounding reservoir; that this reservoir, if empty, would require about 13 days of the mine in full operation to fill it with water; that before this impounding reservoir was used the shaft was raised from the tunnel up through the bed-rock; that the water carrying the mining *debris,* sand, gravel, and tailings was run over the dam into the impounding reservoir at its upper end, where the boulders and coarse sand and gravel immediately deposited, and the finer material graded·down gradually until it struck the still water of the impounding reservoir, and the water, so cleared and freed from the *debris,* flowed from the surface only, over the top of the crib, and fell down the shaft, and ran through the tunnel to its mouth, and into Humbug creek.

The testimony upon the part of the complainant showed that all the water used in the mine, with the material which it carried, was running into the flume and into the impounding reservoir, and that the water which flowed into the settling pool was muddy; but there is no testimony whatever showing that the water flowing out of the settling pool and into the shaft was even discolored. The testimony of complainant's witnesses also affirmatively shows that there were other sources and causes from which the rocks heard rolling along from the mouth of the tunnel in the under current of water, with the *debris* and muddy water, came. It appears therefrom that there is country water flowing over the banks of Malakoff ravine, and from Virgin ravine, which at the time of the visit of the witnesses is variously estimated at from 200 to 250 inches of water, and in the rainy season it is admitted there would be a much greater quantity. It also appears that the water used in the Durbeck mine, which is worked as a drift gravel mine, would be added to the country water above referred to. All the water, gravel, sand, and *debris* from these three sources is emptied into respondent's tunnel above their mining operations, without any agency or control on their part, and for which it is not claimed they are at all liable. The banks of Malakoff ravine are about 300 feet in height, and are composed of loose red soil, loam, and dirt, containing more or less rock and gravel, usually found in hydraulic mining ground. The natural flow of the country water for many years over these banks has caused the same to cave down, and the sand, gravel, and stones therefrom have constantly been carried forward, towards, into, and through the tunnel. The whole testimony, when fairly considered, clearly shows that sand, gravel, rocks, and *debris* from the sources mentioned would find its way through the tunnel, without any reference to the mining operations as conducted and carried on by respondents. It is affirmatively shown, as before stated, that respondents run all the *debris*, sand, gravel, boulders, and other refuse matter into their settling pool, and, if it got in there, it clearly appeared that none of it could get out into the tunnel through the shaft, except such light material as would float in the water. It therefore necessarily follows that the stones heard running through the mouth of the tunnel and other heavy matter, if any, must have come from other sources.

Under these circumstances, should respondents be found guilty of contempt upon the simple showing of discolored and muddy water having been found at the mouth of the tunnel? A contempt of the character here charged is in the nature of a criminal offense, and the proceeding for its punishment is in the nature of a criminal proceeding. No punishment should be inflicted unless the facts constituting the contempt have been clearly and satisfactorily established. Mere presumptions and intendments ought not, in a case like this, where all the facts are accessible, and can readily be ascertained, to be indulged in. Counsel for complainant placed great stress upon the fact that the witnesses in their behalf did not have access to the mine, and that all the facts are within the knowledge of the respondent. The witness Lee testified that

on the occasion of his visit he went to the mine, and saw the words "No admittance," and that he could not find the superintendent; but he also testified that upon other and previous visits he was permitted, with others, to inspect the works, and there is no proof that there was ever any refusal upon the part of respondent to allow the witnesses for the complainant to visit the mine in company with respondent's superintendent, or other officers or employes. Moreover, the character of the works and of the mining operations, as conducted and carried on by the respondents, is plainly to be seen from various points on the surrounding hills, for several miles in extent. There is no pretense that any of the mining operations were in any manner purposely concealed from public view. In the very nature of the locality, and situation of the surrounding country, it would be impossible to carry on the mining operations without publicity. Respondents do not deny that they were engaged in mining.

Counsel for complainant virtually contended in their oral argument, that, before respondents engaged in carrying on their mining operations in the manner stated, they should have applied for a modification of the injunction. If the testimony was sufficient to justify a finding that the water which was used by respondents in conducting their mining operations, and which flowed from the settling pool into the tunnel, and was discharged into Humbug creek, carried any sand, gravel, or *debris*, or other refuse matter, to any appreciable extent, or that respondents were in any other manner running any sand, gravel, etc., into said creek from their mine, it would have been the duty of the master to have found them guilty of contempt. The respondents cannot, in the present condition of the decree, claim the right to conduct or carry on mining operations upon the theory that the amount or quantity of sand, gravel, tailings, which they may run into Humbug creek works no injury to complainant. This court at the time of rendering its decision, anticipating that changed conditions in the method of carrying on the mining operations might arise, which in justice to all parties might require a modification of the decree, wisely provided that any one of the parties enjoined might move to modify the injunction, upon a showing which the court might deem sufficient—

"That the conditions have been so changed that the discharge of said *debris* by said parties or party so applying into said streams, or any of them, may be resumed, or otherwise conducted so as not to create or continue, or contribute to create or continue, the nuisance complained of, or a nuisance of a similar character."

No question is presented in this proceeding which calls for any expression of opinion as to what showing it would be necessary to make to justify or authorize any modification of the decree. It is admitted that the decree does not in terms enjoin respondents from hydraulic mining. If respondents were not discharging any of the *debris* from their mine into Humbug creek, they were not guilty of contempt. The testimony taken before the master, which I have carefully examined, in my opinion fails to show that respondents, on the days men-

tioned in the testimony, in any manner violated any of the provisions of the decree. The contention of counsel for the complainant, that the water which respondents allowed to pass out of the settling pool into the tunnel was a violation of the decree, cannot be sustained.

The exceptions to the master's report are overruled.