NORTH BLOOMFIELD GRAVEL MIN. CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 2, 1898.)

No. 405.

1. NAVIGABLE WATERS—ACT REGULATING HYDRAULIC MINING—CONSTRUCTION.
Act March 1, 1893 (27 Stat. 507), regulating hydraulic mining in California, creating the California débris commission, and prohibiting and declaring unlawful hydraulic mining directly or indirectly injuring the navigability of the Sacramento and San Joaquin river systems, unless the persons desirous of carrying on hydraulic mining file a petition and obtain a permit from the débris commission to carry on such mining, is mandatory in its requirements, and entirely prohibits any hydraulic mining in said territory until such application has been made and permission given. The provisions of the act apply not only to those who contemplate the establishment of such mining, but also to owners who have already erected impounding works, which are required to be approved by the commission before a permit is issued.

2. SAME—POWERS OF CONGRESS.
Act March 1, 1893 (27 Stat. 507), regulating hydraulic mining in California, to the end that the navigable waters of the state shall not be obstructed or injured thereby, is within the constitutional powers of congress to regulate commerce, which includes navigation, by virtue of which powers it has absolute control of all navigable waters within a state which are accessible to interstate or foreign commerce.

3. SAME—CONSTITUTIONALITY OF STATUTE.
The provision of said act requiring the owners of mining ground in the territory drained by the Sacramento and San Joaquin river systems, before engaging in hydraulic mining thereon, to execute an instrument sur-

rendering to the United States the right to regulate the disposal of the débris, the purpose being to prevent the obstruction of the streams, is not unconstitutional, as requiring the surrender of property rights without compensation, as such conveyances in fact add nothing to the authority already possessed by congress.

4. SAME—INJUNCTION—POWER OF COURTS.

The rule that courts will not interfere by injunction with a lawful business, conducted in such a manner as not to cause or threaten injury to others, will not prevent the granting of an injunction restraining hydraulic mining by one who has not complied with the requirements of the act of congress regulating such business, although it is denied that navigable waters are thereby obstructed or injured, as congress has not left the question of such obstruction or injury to be determined by the courts, but has itself predetermined by the act that such business is necessarily injurious, unless conducted as therein provided.

5. SAME—ENJOINING CRIMINAL ACT—PROTECTION OF PROPERTY RIGHTS OF UNITED STATES.

The obstruction or injury of navigable waters is an injury to the property rights of the United States, and may be enjoined at the suit of the government, though the act is also made by law a penal offense.

Appeal from the Circuit Court of the United States for the Northern District of California.

We adopt the following statement of the learned circuit judge with reference to the pleadings and character of this suit:

"This case was submitted upon bill and answer. It involves the construction of the act of congress * * * approved March 1, 1893 (27 Stat. 507). The bill alleges the appointment and qualification of the commissioners provided for by that act, and the entry upon its duties by the commission. It alleges that the defendant company is, and was at the times mentioned in the bill, the owner and in possession of certain mining ground situated on or near the Yuba river and its tributaries, within the territory drained by the Sacramento and San Joaquin rivers, and is, and was during the times mentioned, engaged in working its mining ground by the hydraulic process; that the waters of the Sacramento river flow into Suisun Bay, and thence, through the straits of Carquinez, into San Pablo Bay, and thence, through the Golden Gate, into the Pacific Ocean; that Feather river flows into the Sacramento, and that Yuba river flows into the Feather; that all of these rivers were, at the time of the cession of the territory of Upper California to the United States by the republic of Mexico, to wit, February 2, 1848, and ever since have been, and now are, public navigable rivers, and free highways, for the uses and purposes of commerce and navigation, and during all of the time mentioned were, and still are, navigable, and navigated, by steamboats and other vessels, drawing from 8 to 16 feet of water, and engaged in commerce and navigation within the state of California; that the Sacramento river during all of the time mentioned was, and still is, so navigable, and navigated, by steamboats and other vessels from its mouth to the mouth of Middle Creek, in Shasta county, above the point of confluence of the Sacramento and Feather rivers; that the Feather river during the same time was, and still is, so navigable from its mouth to the mouth of the Yuba river, and that the Yuba river during the same time was, and still is, navigable from its mouth to a point about one mile above its mouth; that all of the rivers mentioned have their principal sources in the western slope of the Sierra Nevada mountains, which lie to the east and northeast of the Sacramento valley, through which the Sacramento river flows, and in a small part of the eastern slope of the Coast Range mountains, which lie to the west of the Sacramento valley; that all of the waters of the western slope of the Sierra Nevada mountains which lies opposite the Sacramento valley are tributary to the rivers mentioned, and that they have their sources in lakes, springs, small streams, and canyons, which receive their waters from the rain and snow which fall each year to a great depth upon the mountains; that the defendant company, in working its mining ground, so dumps and discharges the débris therefrom as that the same, or a portion thereof, is ulti-

mately carried and flows into the Yuba river and its forks, and, with the débris from other mining works operated by the same process, is thence so carried and flows into the Feather, Sacramento, and other streams forming a part of, and tributary to, the Sacramento river system, and thence into the other waters, bays, and straits already mentioned; that hydraulic mining as now, and for more than 20 years last past, practiced and understood in the state of California, is a process of gold mining by which hills, ridges, banks, and other forms of deposits of earth which contain gold are mined and removed from their position by means of large streams of water which, by great pressure, are forced through pipes terminating in nozzles known as 'monitors' or 'little giants'; that the water is discharged from such nozzles with great force, by a water pressure of from 50 to 400 feet per second, against and upon the hills, ridges, banks, and other deposits, which are usually shattered or broken up by means of blasts of powder, and softened by running water over and along such shattered or broken banks of earth, and undermined by streams of water flowing at the foot of such banks, thus caving down and washing off portions thereof before water is discharged from the nozzles against them; that the clay, sand, gravel, stones, rocks, and boulders of which such gold mines are composed, known as 'mining débris,' together with the gold contained therein, are carried and moved by the streams of water into and through flumes, sluices, and other conduits at or adjacent to the respective mining claims, the gold being arrested therein, and the débris being carried by the water through the flumes, sluices, and conduits, and dumped or discharged into impounding basins or reservoirs, and that a part of such débris is thence carried and flows into the adjacent streams or canyons; that the larger and heavier portions of the débris are deposited in such impounding basins or reservoirs, and the smaller and lighter portions, being not less than 50 per cent. thereof, are carried down the streams, and lodged in the rivers and other channels, and upon the lands adjacent thereto; that a portion of such mining débris, ever since the commencement of hydraulic mining within the state, has, during a large part of each year, been deposited and lodged, and is still being deposited and lodged, in the beds and channels of the rivers mentioned, and will continue to be so deposited and lodged while such hydraulic mining continues. The bill next alleges that the defendant company has failed and neglected and refused to file with the California débris commission a verified or any petition setting forth such facts as will comply with the act of congress upon the subject, and with the rules prescribed by the commission, and has not, nor has any one on its behalf, executed and acknowledged the conveyance mentioned in that act, and, notwithstanding such neglect and failure, that the defendant company has continued to mine, and is now engaged in mining, its mining ground by the hydraulic process. The prayer of the bill is for a writ of injunction perpetually enjoining the defendant, its agents, grantees, lessees, and employés, from operating, or allowing to be operated, by the hydraulic process, its mining ground, until it shall make, present, and file with the débris commission the petition set forth in the aforesaid act of congress, accompanied by the conveyance therein mentioned, and otherwise conform to the rules and regulations prescribed by the commission by virtue of that statute. The answer of the defendant company admits the appointment of the commissioners, and their qualification and organization as alleged, and its failure to file with the commission the petition and conveyance mentioned in the act, and the fact of its mining its ground by the hydraulic process notwithstanding. It alleges that its mines and works are all situated adjacent to Humbug creek, a small tributary of one of the main branches of the Yuba river, and within the territory drained by the Sacramento river system. It admits the fact of the navigability of the Sacramento, Feather, and Yuba rivers, but denies the extent of the navigability alleged in the bill. It admits the sources of the rivers as alleged. It denies that it so dumps and discharges the débris from its mines and works, or any thereof, in such manner that the same, or any material portion of it, is ultimately carried or flows into the Yuba, Feather, or Sacramento rivers, or other streams forming a part of or tributary thereto, or upon the lands adjacent thereto; but avers that only a trifling quantity of the débris from the defendant's mining ground escapes from, or passes beyond, the impounding works

and reservoirs of the defendant company, and that the same consists solely of light, flocculent matter of about the same specific gravity as water, and so finely comminuted as to readily float in and be moved by the slightest movement of the water in which it is suspended, and that all of the matter so escaping from, or passing beyond, the defendant's impounding works, is carried in suspension in the streams of water until it reaches the Suisun Bay, and that from the head of Suisun Bay, by the tidal currents and movements of the water of that bay, of the Carquinez Straits, San Pablo Bay, and the Bay of San Francisco, and the tidal currents passing in and out of the Golden Gate, it is all carried and swept into the ocean at distances remote from the land or navigable streams of the state of California, and does not deposit in any place where it either injures, or threatens to injure, any navigable waters within the jurisdiction of the United States. The answer further denies that any portion of the débris from the defendant's mines or mining works, at any time since the passage of the act of congress in question, has been deposited or lodged in the beds or channels of either of the rivers named, and denies that any of such débris will be so deposited or lodged while it continues the mining of its ground by the hydraulic process. The answer further avers that about the years 1887 and 1888 the defendant erected upon its mining ground. which had been conveyed to it for placer mining purposes by the government of the United States, extensive, complete, and expensive impounding works, which have ever since been so maintained as to successfully, completely, and permanently impound all of the mining débris resulting from its mining operations, upon its mining ground, except such light and inconsiderable portion of the débris therefrom as will not settle in water when affected by the least motion, nor when such water is at rest, unless the same be maintained in a condition of rest for a long period of time, and that such light and flocculent matter, when it passes from the defendant's impounding works, flows into Humbug creek, which creek flows with a rapid current into the South Yuba river, and that the South Yuba river flows with a rapid current into the Main Yuba river, and that the Main Yuba river flows with a rapid current into the Feather river, and that the Feather river flows with a rapid current into the Sacramento river; that the Sacramento river, with a moderate current, flows into Suisun Bay, and that from the head of Suisun Bay to the waters remote from the Golden Gate the waters are constantly agitated and rapidly moved by tidal currents, and that the light and flocculent matter which so escapes from the defendant's impounding works is carried by the currents of the streams mentioned, and by the tidal currents in the other navigable waters named, out of the Golden Gate, and to localities remote from the shores of the Pacific Ocean, and that no part thereof does injure, or threaten to injure, either by itself, or in connection with débris from other mines, any of the navigable waters mentioned in the bill, or any other waters. The answer further alleges that on the 25th day of June, 1888, the United States filed in this court its bill in equity against this defendant, containing all of the averments of the present bill, except the allegations with regard to the act of congress of March 1, 1893 (which was not then in existence), and the appointment of the members of the commission thereby created, and the allegations with respect to the failure of the defendant to file with the commission the petition and conveyance required by that act; that thereafter, and on July 1, 1889, the defendant filed its answer to that bill of complaint, alleging the construction and maintenance of the aforesaid impounding works, and that thereby the débris from its mining ground was sufficiently and permanently impounded and restrained as is alleged in the present answer, and that thereby the navigable waters mentioned were prevented from being injured or threatened with injury from the débris from the defendant's mines; that thereafter a trial was duly had upon the issues framed in the cause, upon which trial it was duly adjudged that the defendant's mining by the hydraulic process did not injure, or threaten to injure, the navigable streams, or any of the navigable waters, of the state of California, or any of the lands adjacent thereto, and that the defendant could continue its hydraulic mining operations by the use of its said impounding works without injuring, or threatening to injure, any of the navigable waters of the state of California, and without injuring, or threatening to injure, the navigability of any of the navigable streams

of the state, and that ever since that time the defendant has maintained its said impounding works, and its hydraulic mining operations have ever since been conducted in the same manner (and in no other manner) that it was in that action adjudicated they might be, without injury to any water or lands; that the mining ground and works described in the bill in the present suit and in the bill in the former suit are the same." 81 Fed. 243.

In the consideration of the questions involved in this case, reference is made in the opinion to the following provisions of the act:

"Section 1. That a commission is hereby created, to be known as the 'California Débris Commission,' consisting of three members. The president of the United States shall, by and with the advice and consent of the senate, appoint the commission from officers of the corps of engineers, United States army. * * * It shall have the authority, and exercise the powers hereinafter set forth, under the supervision of the chief of engineers and direction of the secretary of war."

"Sec. 3. That the jurisdiction of said commission, in so far as the same affects mining carried on by the hydraulic process, shall extend to all such mining in the territory drained by the Sacramento and San Joaquin river systems in the state of California. Hydraulic mining, as defined in section 8 hereof, directly, or indirectly injuring the navigability of said river systems, carried on in said territory other than as permitted under the provisions of this act is hereby prohibited and declared unlawful.

"Sec. 4. That it shall be the duty of said commission to mature and adopt such plan or plans, from examinations and surveys already made and from such additional examinations and surveys as it may deem necessary, as will improve the navigability of all the rivers comprising said systems, deepen their channels, and protect their banks. Such plan or plans shall be matured with a view of making the same effective as against the encroachment of and damage from débris resulting from mining operations, natural erosion, or other causes, with a view of restoring, as near as practicable and the necessities of commerce and navigation demand, the navigability of said rivers to the condition existing in eighteen hundred and sixty, and permitting mining by the hydraulic process, as the term is understood in said state, to be carried on, provided the same can be accomplished, without injury to the navigability of said rivers or the lands adjacent thereto."

"Sec. 9. That the individual proprietor or proprietors, or in case of a corporation its manager or agent appointed for that purpose, owning mining ground in the territory in the state of California mentioned in section three hereof, which it is desired to work by the hydraulic process, must file with said commission a verified petition, setting forth such facts as will comply with law and the rules prescribed by said commission.

"Sec. 10. That said petition shall be accompanied by an instrument duly executed and acknowledged, as required by the law of the said state, whereby the owner or owners of such mine or mines surrender to the United States the right and privilege to regulate by law, as provided in this act, or any law that may hereafter be enacted, or by such rules and regulations, as may be prescribed by virtue thereof, the manner and method in which the débris resulting from the working of said mine or mines shall be restrained, and what amount shall be produced therefrom; it being understood that the surrender aforesaid shall not be construed as in any way affecting the right of such owner or owners to operate said mine or mines by any other process or method now in use in said state: provided, that they shall not interfere with the navigability of the aforesaid rivers."

Section 14 provides that upon the completion of such works as may be authorized and required by order of the commission, "if found in every respect to meet the requirements of the said order and said approved plans and specifications, permission shall thereupon be granted to the owner or owners of such mine or mines to commence mining operations, subject to the conditions of said order and the provisions of this act."

"Sec. 15. That no permission granted to a mine owner or owners under this act shall take effect, so far as regards the working of a mine, until all impound-

ing dams or other restraining works, if any are prescribed by the order granting such permission, have been completed and until the impounding dams or other restraining works or settling reservoirs provided by said commission have reached such a stage as, in the opinion of said commission, it is safe to use the same: provided, however, that if said commission shall be of the opinion that the restraining and other works already constructed at the mine or mines shall be sufficient to protect the navigable rivers of said system and the work of said commission, then the owner or owners of such mine or mines may be permitted to commence operations."

"Sec. 17. That at no time shall any more débris be permitted to be washed away from any hydraulic mine or mines situated on the tributaries of said rivers and the respective branches of each. worked under the provisions of this act, than can be impounded within the restraining works erected."

"Sec. 22. * * * Any person or persons, company or corporation, their agents or employés, who shall mine by the hydraulic process directly or indirectly injuring the navigable waters of the United States, in violation of the provisions of this act, shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both such fine and imprisonment, in the discretion of the court."

C. W. Cross, for appellant.
Samuel Knight, U. S. Atty.

Before GILBERT and MORROW, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge.     This is a suit in equity to restrain appellant from mining, by the hydraulic process, until it complies with the provisions of the act of March 1, 1893, entitled "An act to create the California débris commission and regulate hydraulic mining in the state of California." 27 Stat. 507. The case, by agreement of counsel, was submitted upon the bill and answer, which are fully set out in the statement of facts, to which reference is here made.

The importance of this case, as affecting the rights of the people in this state, demands a thorough examination of the various questions presented by the respective counsel, and of the authorities cited in support of their contentions.     It is safe to say, in the outset, that no stone has been left unturned by the respective counsel that would reveal any additional reasons than are presented in their briefs or urged by them upon the oral argument, or furnish any other authorities which support, or tend to support, the views which they have thus advanced.

The general contention of appellant is (1) that, under the act in question, no one is prohibited from carrying on the business of hydraulic mining without first granting to the United States the right to control its mining operations as in said act provided, and obtaining a permit from the California débris commission, but that said act grants to the owner of the hydraulic mine the right to apply for such permit, upon the condition of making said grant, and that, if he obtains such permit, he obtains all the benefits, privileges, and advantages which the law provides under such permit; (2) that in no case will a court enjoin the conduct of a lawful business, so long as the same is conducted as neither to do nor threaten any injury whatever.

The constitutionality of the act is not directly assailed. The diverging lines of the respective counsel are in relation to the proper construction of the act in its entirety, and particularly with reference to the various provisions heretofore quoted in the general statement of the case.

In order that appellant's position may be clearly understood upon this point, we quote from his brief:

"We do not contend, nor have we contended, that the act is unconstitutional; but we do insist that the construction contended for by complainant's counsel would render the act both unconstitutional and against natural right."

In another part of the brief it is said:

"If the contention, however, of complainant's counsel, is correct, that the present act is mandatory in its requirements upon hydraulic miners, then it is certain that congress has made an unconstitutional invasion upon the rights of this state to regulate its own affairs, and has even gone further than the state itself could do under its own constitution; for such law would be distinctly special and unjustly discriminating legislation, since it would apply only to the hydraulic miner, and there is no reason why a miner by this process should be regulated or prohibited from obstructing or injuring navigation, while miners by any other process or farmers, and all other persons, should be permitted to do so."

Again, referring to section 10 of the act, which he claims gives to every hydraulic miner the option whether to avail himself of the privilege of the act or not, he says:

"If this section is mandatory, it is thoroughly unconstitutional, as it requires the miner to surrender his right to the use and enjoyment of his mine, and the right to conduct his business and mining operations in his own way, not detrimental to the rights of others. If he must surrender this, under the behest of law, he must be afforded just compensation; all this upon elementary principles and upon authorities too numerous for mention here."

The real question to be determined is whether the provisions of the act are directory and permissive or mandatory in their character. A judicial interpretation of this question will determine whether appellant's contention is correct or erroneous. We shall endeavor to confine ourselves to a consideration of the material and controlling questions involved herein, without commenting on matters that have been discussed by counsel which are deemed irrelevant, except when a reference thereto is considered necessary in order to show that the arguments or authorities relied upon have no application to this case.

Is the act mandatory or directory and permissive? What was the object and intention of congress in passing the act in question?

It is the first duty of the court, in considering what construction should be given to a statute, to ascertain the intention congress had in view at the time of its passage; its object and purpose; the occasion and necessity of the law; the mischiefs or evils it was intended to prevent; and the remedies it proposed to give. In the determination of these questions a wide field is opened for investigation. The history of the times which brought about the legislation upon the subject always constitutes an important factor, and should never be overlooked. It often furnishes the key that unlocks and makes clear the object, intent, and purpose of legislative bodies in enacting laws.

And especially is this true in the present case, where the questions have been for several years so earnestly pressed upon the public mind as to what could or should be done in order to allow hydraulic mining to be conducted and carried on within the watersheds of the Sacramento, San Joaquin, and other rivers in the state, without producing injury to other interests of equal value and importance.

Hydraulic mining was for many years one of the principal industries largely carried on in several of the mining counties. The decision in Woodruff v. Mining Co. (rendered in 1884) 9 Sawy. 441, 18 Fed. 753, and generally known as "The Mining Débris Case," was far-reaching in its effects. The blow, judicially made necessary for the preservation of property rights, was a heavy and severe one. It virtually deprived many persons of their means of livelihood, and prevented property owners having vast and valuable mining interests from working upon or in any manner using their property. It not only crippled this industry, but, for the time being, destroyed it, by enjoining the mine owners from further conducting or carrying on their said business. Communities where such operations had been carried on were paralyzed, and scarcely knew what to do. For a time there were more or less attempts to carry on such work by stealth or secrecy, and thus violate the injunctions that had been issued. These efforts, as a matter of course, proved futile. An anti débris organization was formed; guards were employed, who were looked upon as spies by the miners; proceedings were instituted; and, after much delay and difficulty, service was made upon the owners of the mines, and many of them were found guilty of contempt, and heavy fines were imposed. Those contempt proceedings were expensive upon all parties concerned. The United States finally took active steps to prevent injury to the navigable waters of the state. Mine owners then, in their individual capacity, at great expense, erected restraining dams to impound the tailings and débris, and prevent all injurious matter from flowing down into the navigable rivers. This, for a short time, quieted the intense feeling of bitterness that had been engendered, but it did not meet with the success it was hoped would prevail. Proceedings for contempt were again instituted; some of the parties engaged in mining by these methods were found guilty; and occasionally, at other times, were able to prove their innocence as to the particular acts complained of.

In Woodruff v. Mining Co., 45 Fed. 129, 132, the question as to the right to have the original injunction modified was referred to by the court. Thereafter, in U. S. v. North Bloomfield G. M. Co., 53 Fed. 625, which was a suit to enjoin respondent (appellant herein) from continuing its hydraulic mining operations so as to obstruct or endanger the navigation of certain rivers, an injunction was denied. The circuit judge said:

"In arriving at this conclusion, I am not unmindful of the great damage to navigation that has heretofore resulted from the deposit of mining débris in these streams, nor of the important interests that are involved; but I am convinced that, in the case of this particular mine, the contingency has arisen which was contemplated in the decision of this court in the Mining Débris

Case, in providing that the decree might thereafter be modified upon a show-ing to the court that a plan to obviate the injuries had been successfully exe-cuted."

This opinion was rendered October 5, 1892. On the same day the same court rendered a decision in a similar suit of U. S. v. Lawrence, Id. 632, and upon the particular facts of that case ordered an injunc-tion to issue as prayed for in the bill. All of these things brought about an organization of the miners having for its purpose, among other things, the procuring of some legislation whereby the right to carry on hydraulic mining might be regulated and protected; that, upon compliance with certain conditions, permits might be given which would authorize and allow people interested in this character of property to pursue their business without further let or hindrance.

In all of the proceedings, in the state and national courts, it was conceded that hydraulic mining was not of itself unlawful or neces-sarily injurious to any one. As was said in Yuba Co. v. Cloke, 79 Cal. 239, 243, 21 Pac. 740, 741:

"The unlawful nature of the business results from the manner in which it is carried on, and the neglect of parties engaged therein to properly care for the débris resulting therefrom, whereby it is allowed to follow the stream, and eventually cause injury to property situated below."

The business of hydraulic mining, if properly conducted, so as to not interfere with the rights of others or with the navigability of the rivers, was never objected to. It was recognized by all classes that, if hydraulic mining could be so conducted and carried on, it would be beneficial, instead of prejudicial, to the state and nation. The agitation of this subject between the miners and agriculturalists, and persons engaged in other business pursuits within the state, brought about the introduction and passage of the act in question, in order to give greater protection to the navigability of the rivers in this state, over which the congress of the United States had jurisdiction, and at the same time to enable the mine owners to avoid the difficulties and disabilities by which they had for so many years been surrounded.

The bare statement of these events, in the order of their occur-rence, of itself carries conviction to the mind that congress must have intended to make the provisions of the act mandatory. But a care-ful consideration of the terms of the act makes this result absolutely conclusive. It changed the rules which had hitherto prevailed, and adopted a new system, perhaps not perfect in all its parts, containing provisions which, it is safe to say, were, at the time of its enactment, if not entirely satisfactory to the miners, agreed to by them as giving greater rights and privileges than they had theretofore for many years possessed. The act created a commission "to be known as the 'Cali-fornia Débris Commission,'" and invested it with certain powers specifically mentioned in its provisions, and gave it jurisdiction over all the mines worked by hydraulic process which are situate within "the territory drained by the Sacramento and San Joaquin river sys-tems in the state of California"; and it declares, in express terms, that hydraulic mining, as defined in section 8 of the act, "directly or indirectly injuring the navigability of said river systems carried on

in said territory, other than as permitted under the provisions of this act, is hereby prohibited and declared unlawful." It further, and in equally explicit terms, declares that mine owners who desire to work by this process "must file with said commission a verified petition, setting forth such facts as will comply with the law and the rules prescribed by said commission." It provides the steps that shall be taken by the commission after the receipt of said petition, and designates the methods, and specifies the manner, in which the preliminary operations for the construction of restraining dams or impounding works at the mines shall be conducted; and upon the completion thereof, and compliance with all the details mentioned in the act, it declares that "permission shall thereupon be granted to the owner or owners of such mine or mines to commence mining operations, subject to the conditions of said order and the provisions of this act." The act is intended to apply, and does apply, to appellant herein, and all others who had, previous to the passage of the act, constructed impounding works. They are placed upon the same plane, subject to the same law, and the rules and regulations adopted by the commission, as those who had not erected such works, but are compelled to do so before engaging in hydraulic mining. The act provides "that if said commission shall be of opinion that the restraining and other works already constructed at the mine or mines shall be sufficient to protect the navigable rivers of said system, and the work of said commission, then the owner or owners of such mine or mines may be permitted to commence operations." 27 Stat. 509, § 15.

It would serve no useful purpose to further discuss other provisions in the law. The references already made, and provisions heretofore quoted, clearly show that the act means just what it says. When it declares that certain things must be done before any permit is given, it means that they shall be done; and if these things are not done, as therein provided, no permit can be issued, and if none is procured the working of the mine by the hydraulic process is prohibited and made unlawful. It would also be a waste of time to discuss in detail the kind and character of cases that are to be found in the books wherein the word "may" is construed as meaning "shall," or the word "must," under rare and exceptional provisions, has been held to mean "may." It is enough to say that the language and terms of the act in question, when viewed in the light of the history of the times, and all the surrounding conditions, are clear, certain, positive, and mandatory. Any other view would unquestionably lead to absurd results, which all courts declare should be avoided in the construction of any statute. There would be no positive protection either to the miners, farmers, or the government; litigation and strife, which it was the object of the statute to avoid, would continue to reign supreme.

We have suggested that the act might not be perfect in all its parts. It would not be difficult to criticise some of its provisions, and to mention others that were not absolutely essential or necessary to have been inserted. One instance is pointed out in the opinion of the circuit judge, viz. that the provisions in section 10,

which require a conveyance from the mine owners so as to vest in congress the power to make regulations concerning the manner in which the work thereon might be conducted, were wholly unnecessary, as that power is vested without any conveyance being required. The argument of counsel as to the provisions of section 10 may, therefore, be eliminated from the case, not because they are unconstitutional, but upon the ground that congress has the unquestioned power to regulate the business of hydraulic mining without requiring any conveyance from the mine owners, as will hereinafter fully appear.

The power of congress to pass the act in question, mandatory in its requirements, as we construe it, notwithstanding the array of authorities cited by appellant, cannot, in our opinion, at this late day, be judicially questioned. Congress has the power and authority to control commerce and navigation on the navigable portions of the Sacramento and San Joaquin rivers and their tributaries, and to prevent any obstruction on such streams, or the performance of any act, by any person or persons, which would tend in any manner to interfere with interstate or foreign commerce.

In Gibbons v. Ogden, 9 Wheat. 1, 190, 195, Chief Justice Marshall said:

"If commerce does not include navigation, the government of the Union has no direct power over that subject, and can make no law prescribing what shall constitute American vessels, or requiring that they shall be navigated by American seamen. Yet this power has been exercised from the commencement of the government, has been exercised with the consent of all, and has been understood by all to be a commercial regulation. All America understands, and has uniformly understood, the word 'commerce' to comprehend navigation. It was so understood, and must have been so understood, when the constitution was framed. The power over commerce, including navigation, was one of the primary objects for which the people of America adopted their government, and must have been contemplated in forming it. The convention must have used the word in that sense, because all have understood it in that sense, and the attempt to restrict it comes too late. * * * But, in regulating commerce with foreign nations, the power of congress does not stop at the jurisdictional lines of the several states. It would be a very useless power, if it could not pass those lines. The commerce of the United States with foreign nations is that of the whole United States. Every district has a right to participate in it. The deep streams which penetrate our country in every direction pass through the interior of almost every state in the Union, and furnish the means of exercising this right. If congress has the power to regulate it, that power must be exercised whenever the subject exists. If it exists within the states, if a foreign voyage may commence or terminate at a port within a state, then the power of congress may be exercised within a state."

In Gilman v. Philadelphia, 3 Wall. 713, 724, the court said:

"Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a state other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation by congress. This necessarily includes the power to keep them open and free from any obstruction to their navigation, interposed by the states or otherwise; to remove such obstructions when they exist; and to provide, by such sanctions as they may deem proper, against the occurrence of the evil and for the punishment of offenders. For these purposes congress possesses all the powers which existed

in the states before the adoption of the national constitution, and which have always existed in the parliament in England. It is for congress to determine when its full power shall be brought into activity, and as to the regulations and sanctions which shall be provided."

Such has uniformly been the construction given to that clause of the constitution which confers upon congress the power to regulate commerce. From an early period in the history of the government it has been so understood and determined. Willson v. Marsh Co., 2 Pet. 245; Cooley v. Board, 12 How. 299; State of Pennsylvania v. Wheeling & Belmont Bridge Co., 18 How. 421; South Carolina v. Georgia, 93 U. S. 4, 10; Mobile Co. v. Kimball, 102 U. S. 691; Bridge Co. v. U. S., 105 U. S. 470, 475, 479; Escanaba & L. M. Transp. Co. v. City of Chicago, 107 U. S. 678, 682, 2 Sup. Ct. 185; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 826; In re Debs, 158 U. S. 564, 15 Sup. Ct. 900; New York, N. H. & H. R. Co. v. People, 165 U. S. 628, 631, 17 Sup. Ct. 418; Railway Co. v. Parsons, 20 C. C. A. 481, 74 Fed. 408, 411; U. S. v. City of Moline, 82 Fed. 592; Craig v. Kline, 65 Pa. St. 399, 411, 414.

This admitted control upon the part of the general government over the navigable waters within the respective states is absolute. Does it not, therefore, necessarily follow that, in the exercise of such dominion and control, congress can determine and declare what constitutes an obstruction, injury, or interference to the navigable waters of the state, or an obstruction to commerce thereon, as well as to determine and declare what acts shall be performed, and what character of works shall be constructed, in order to prevent injury to the navigable waters or an obstruction to commerce?

In Miller v. Mayor, etc., 109 U. S. 385, 393, 3 Sup. Ct. 228, 232, the court held that it was competent for congress, having authorized the construction of a bridge of a given height over a navigable water, to empower the secretary of war to determine whether the proposed structure would be a serious obstruction to navigation, and to authorize changes in the plan of the proposed structure. The construction of the bridge in that case was made, under the statute, to depend upon the determination of the secretary of war as to whether the bridge when built would conform to the prescribed conditions of the act "not to obstruct, impair or injuriously modify the navigation of the river." The act further provided that until the secretary approved the plan and location, and notified the company of the same in writing, the bridge should not be built or commenced. In the course of the opinion the court said:

"It is contended by the plaintiff with much earnestness that the approval of the secretary of war of the plan and location of the bridge was not conclusive as to its character and effect upon the navigation of the river, and that it was still open to him to show that, if constructed as proposed, it would be an obstruction to such navigation, as fully as though such approval had not been had. It is argued that congress could not give any such effect to the action of the secretary, it being judicial in its character. There is in this position a misapprehension of the purport of the act. By submitting the matter to the secretary congress did not abdicate any of its authority to determine what should or should not be deemed an obstruction to the navigation of the river. It simply declared that, upon a certain fact being established, the bridge should be deemed a lawful structure, and employed

the secretary of war as an agent to ascertain that fact. Having power to regulate commerce with foreign nations and among the several states, and navigation being a branch of that commerce, it has the control of all navigable waters between the states, or connecting with the ocean, so as to preserve and protect their free navigation. Its power, therefore, to determine what shall not be deemed, so far as that commerce is concerned, an obstruction, is necessarily paramount and conclusive. It may in direct terms declare absolutely, or on conditions, that a bridge of a particular height shall not be deemed such an obstruction, and, in the latter case, make its declaration take effect when those conditions are complied with. The act in question, in requiring the approval of the secretary before the construction of the bridge was permitted, was not essentially different from a great mass of legislation directing certain measures to be taken upon the happening of particular contingencies or the ascertainment of particular information. The execution of a vast number of measures authorized by congress and carried out under the direction of heads of departments, would be defeated if such were not the case. The efficiency of an act as a declaration of legislative will must, of course, come from congress, but the ascertainment of the contingency upon which the act shall take effect may be left to such agencies as it may designate."

The contention of appellant that courts will not enjoin the conduct of a lawful business, when the same is being conducted in such a manner as not to cause any injury, or to threaten any injury, as a general rule, is undisputed. But the attempt to apply this rule to the facts in this case begs the real questions involved herein.

Great reliance is placed upon the principles announced in City of Janesville v. Carpenter, 77 Wis. 288, 46 N. W. 128, which, in all essential respects, is entirely dissimilar in its nature and character to the case at bar. That was an action to restrain the driving of piles in the bed of a river in the city, and the erection thereon of a building fronting on a bridge, not upon the ground that such acts constituted any injury to the navigable waters of the state or to any of the property rights of the city, but upon the ground that if said building was erected it might lead others to erect similar buildings, so that, in the course of time, the flow of water might be obstructed, and the city and its inhabitants greatly prejudiced and injured, by obstruction to the circulation of air, and danger of fires and floods, etc. The allegation of the complaint left the effect of the erection of the building in question, in so far as it was claimed it might be likely to result in injury to any private or public interest, to mere prediction and conjecture. It was obscure and defective. The court took occasion to distinguish that action from the class of cases to which this suit belongs. Among other things, the court said:

"The action does not involve any question of obstruction or injury to navigation, or of injury to any public right. * * * The complaint does not show that the proposed building would be a private or a public nuisance. * * * The argument of the learned counsel of the respondents, and the authorities cited on the question whether the proposed building will obstruct the navigation of the river, are impertinent to the case. There is nothing in the case that involves any such question in the remotest degree."

In the light of the character of that action and of these expressions in the opinion, we must confess our inability to fully appreciate the suggestion of appellant's counsel that it is directly in point upon the facts of a case like this, when the court that rendered it expressly said that it does not apply to such a case "in the remotest degree." The

truth is that appellant's argument proceeds upon the erroneous theory that the act under consideration, if construed to be mandatory, is an unconstitutional exercise of legislative power. As that position cannot be maintained upon reason or authority, we might, with propriety, again quote from the same opinion, and say that "the argument of the learned counsel [and the authorities cited by him] are impertinent to the case" under consideration.

Other authorities cited by counsel are based upon the general principles announced in High on Injunction (volume 1 [3d Ed.] § 20), as follows:

"The subject-matter of the jurisdiction of equity being the protection of private property and of civil rights, courts of equity will not interfere for the punishment or prevention of merely criminal or immoral acts, unconnected with violations of private right. Equity has no jurisdiction to restrain the commission of crimes or to enforce moral obligations and the performance of moral duties; nor will it interfere for the prevention of an illegal act merely because it is illegal. And, in the absence of any injury to property rights, it will not lend its aid by injunction to restrain the violation of public or penal statutes or the commission of immoral and illegal acts."

Conceding these views to be correct, wherever applicable, it does not necessarily follow, as claimed by counsel, that no injunction can be maintained in this case.

The argument of appellant that "the act left hydraulic mining without injury to navigable streams exactly where it stood before the passage of the act" cannot be sustained. The question is not left to the courts to determine whether the acts committed by any individual mine owner, in any particular manner, are injurious or not. The fact is that the question as to whether the acts committed by appellant are injurious to the free navigation of the river is settled by the terms of the act itself, which, in all of its provisions, proceeds upon the ground that injury must necessarily result from hydraulic mining, unless conducted and carried on in the manner permitted by the act. Under the law, mine owners engaged in hydraulic mining have no right to use the streams without the permission of the commissioners appointed under the provisions of the act. In other words, the act of congress, of itself, prohibits all hydraulic mining unless its terms are first complied with. The whole case is virtually disposed of in the conclusions already reached, that the act is mandatory and constitutional. But the earnestness of appellant in presenting this branch of the case seems to justify, if it does not demand, some further and independent consideration.

The navigable rivers being "the property of the nation," it follows that any injury to them which affects the commerce of the country is an injury to property rights, and the mere fact that penalties are imposed upon all parties found guilty of violating any of the provisions of the act does not, of itself, prevent the issuance of an injunction to protect the property rights of the government in the rivers. Wherever commerce among the states goes, the power of the nation, as represented by the courts of the United States, goes with it to protect and enforce its rights. The restraining power of equity extends throughout the whole range of rights and duties which are recognized by law. As is said in 3 Pom. Eq. Jur. § 1338:

"Wherever a right exists or is created, by contract, by the ownership of property or otherwise, cognizable by law, a violation of that right will be prohibited, unless there are other considerations of policy or expediency which forbid a resort to this prohibitive remedy. * * * The incompleteness and inadequacy of the legal remedy is the criterion which, under the settled doctrine, determines the right to the equitable remedy of injunction."

Having shown the authority of congress to act in the premises, and its power to prohibit any character of business from being conducted which interferes with the commercial navigation of the rivers, does it not follow, as a logical sequence, that a court of equity, in protecting such property rights, must have the jurisdiction, and power to issue an injunction, in aid of the enforcement of the regulations which congress has prescribed, in order to preserve the right?

The distinction existing between this case and the character of cases cited and relied upon by appellant, it seems to us, is manifest and clear. A court of equity does not possess any jurisdiction to enjoin the commission of a mere crime. A threat upon the part of an individual, or individuals, to commit an offense against the law, does not, of itself, authorize a court of equity to issue an injunction to prevent it. The penal statutes which impose punishment by fine or imprisonment, or by both, are ordinarily deemed sufficient to deter parties from the commission of such offenses. There must be some interference, either actual or threatened, connected with the property rights of a public or pecuniary nature, in order to vest the court with the power and authority to issue this prohibitive writ. But, when such interference plainly appears, the jurisdiction of the court at once attaches, and cannot be destroyed by the fact that the law declares that such acts may be punished criminally. Whenever an attempt is made to deny a constitutional right given by a statute it is vain and ineffectual, and should, without hesitation, be so declared by the court; otherwise there would be a deprivation of the power of the court in extreme cases to make such statutes effective. As was said by the court in Boyd v. U. S., 116 U. S. 616, 635, 6 Sup. Ct. 524, 535: .

"It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be, 'Obsta principiis.' "

Certainly this duty must apply with equal force to the constitutional rights of the government when they are wrongfully attempted to be invaded, interfered with, or destroyed. The court should undoubtedly, at all times, be cautious in the exercise of this power, but it should not deny the preservation of property rights when other remedies are clearly shown to be wholly inadequate.

In Port of Mobile v. Louisville & N. R. Co., 84 Ala. 115, 126, 4 South. 106, the court said:

"The mere fact that an act is criminal does not devest the jurisdiction of equity to prevent it by injunction, if it be also a violation of property rights, and the party aggrieved has no other adequate remedy for the prevention of the irreparable injury which will result from the failure or inability of a court of law to redress such rights."

The varied interests of the government of the United States in interstate commerce, and the free navigability of its rivers, are often en-

titled to greater protection than is afforded by the simple punishment which the statute provides for those who interfere therewith.

In Attorney General v. Aqueduct Corp., 133 Mass. 361, a suit in equity, upon information by the attorney general, was sustained against a quasi public corporation doing and contemplating acts which were ultra vires and illegal, the necessary effects of which were not only to impair the rights of the public in the use of one of the great ponds of that commonwealth for the purposes of fishing and boating, in such a manner as to create a nuisance by lowering the pond and exposing upon its shores slime, mud, and offensive vegetation detrimental to the public health. Numerous cases were referred to as establishing the proposition that a suit in equity could be maintained to restrain a corporation, exercising the right of eminent domain under the power delegated to it by the legislature, from any abuse or perversion of the powers which may create a public nuisance, or injuriously affect or endanger the public interests. In that case the information, among other things, alleged that the necessary effects of the acts that were being performed by the corporation would be to create a public nuisance. With reference to this point the court said: "This brings the case within the established principle that the court has jurisdiction in equity to restrain and prevent nuisances." In answer to the contention of the corporation that the law furnished a plain, adequate, and complete remedy for this nuisance by an indictment, or by proceedings under the statute for the abatement of the nuisance, the court said:

"Neither of these remedies can be invoked until a part of the mischief is done, and they could not, in the nature of things, restore the pond, the land, and the underground currents to the same condition in which they are now. In other words, they could not remedy the whole mischief. The preventive force of a decree in equity, restraining the illegal acts before any mischief is done, gives clearly a more efficacious and complete remedy."

And in the course of the opinion, upon a point bearing closer analogy to the case in hand, the court said:

"There is another ground upon which, in our opinion, this information can be maintained, though, perhaps, it belongs to the same general head of equity jurisdiction, of restraining and preventing nuisances. The great ponds of the commonwealth belong to the public, and, like the tide waters and navigable streams, are under the control and care of the commonwealth. The rights of fishing, boating, bathing, and other like rights, which pertain to the public, are regarded as valuable rights, entitled to the protection of the government. Inhabitants of West Roxbury v. Stoddard, 7 Allen, 158; Attorney General v. Woods, 108 Mass. 436; Com. v. Vincent, Id. 441. If a corporation or an individual is found to be doing acts without right, the necessary effect of which is to destroy or impair these rights and privileges, it furnishes a proper case for an information by the attorney general to restrain and prevent the mischief." Calder v. Bull, 3 Dall. 386, 388; Mayor, Etc., of Georgetown v. Alexandria Canal Co., 12 Pet. 91, 98; Coosaw M. Co. v. South Carolina, 144 U. S. 550, 567, 12 Sup. Ct. 689; U. S. v. Mississippi & Rum River Boom Co., 3 Fed. 548, 551; Woodruff v. Mining Co., 18 Fed. 753, 769; Vanderhurst v. Tholcke, 113 Cal. 147, 150, 45 Pac. 266; Attorney General v. Birmingham Borough, 4 Kay & J. 528, 540; 2 Story, Eq. Jur. (12th Ed.) §§ 921–924; 3 Pom. Eq. Jur. § 1349; Kerr, Inj. 263; 1 Joyce, Inj. 120 (50); 2 High, Inj. § 1554.

Under the provisions of the act in question, hydraulic mining, in the territory named, is prohibited unless the terms and conditions

which they impose are complied with. If those provisions are detrimental and injurious, instead of beneficial, to the mining interests they were intended to foster, encourage, and protect, the efforts of all those interested in that particular business should be directed to have the act repealed or amended, instead of attempting to evade it or to destroy its efficacy. While it remains as the law upon this subject, it must be obeyed.

The decree of the circuit court is affirmed.