[Sac. No. 2555.    In Bank.—March 14, 1917.]

## SAMUEL GRAY et al., Respondents, v. RECLAMATION DISTRICT No. 1500 et al., Appellants.

RECLAMATION DISTRICT—ACT CREATING PUBLIC STATUTE—EXECUTION OF —INJUNCTION TO PREVENT.—The act creating Reclamation District No. 1500 is a public statute, and the construction of levees provided for by it is the execution of this statute; and injunction will not lie, at the instance of property owners within the district, to prevent the construction of levees called for by the act, or the destruction of others already constructed, on the ground that the work is a private nuisance by reason of the resultant backing up of the water over part of plaintiffs' lands and an unlawful exercise of the right of eminent domain, damaging their property without compensation first paid therefor.

ID.—CONTROL OF NAVIGABLE WATERS—POWER OF GOVERNMENT.—The right of control of navigable waters by the government embraces within it not alone the power to destroy the navigability of certain

waters for the benefit of others, but extends, in the case of streams, to the power to regulate and control the navigable or non-navigable tributaries, to the erection of structures along or across the stream, to deepening or changing the channel, to diverting or arresting tributaries; in short, to do anything subserving the great purpose; and, in general, when an act is done, if it does not embrace the actual taking of property, but results merely in some injurious effect upon the property, the property owner must, for the sake of the general welfare, yield uncompensated obedience.

ID.—SOURCE OF POWER.—The general power of the government over the control of navigable waters, so far as the national government is concerned, is found in the constitutional grant to the United States of the right to regulate commerce with foreign nations and among the states, and the state's power in this regard is limited only by the supervisory control which the paramount authority may exercise over it. This power over navigable waters and over navigation is essentially an attribute of sovereignty, and some of its forms find expression in the exercise of the police power.

ID.—EXECUTION OF POLICE POWER.—Owing to the inseparable connection between navigation and flood control, and owing to the further fact that the state is interested in flood control, not alone as affecting navigation, but as affecting its general welfare and benefit in the reclamation of vast domains of land, the exercise of the police power under these circumstances presents a twofold aspect; first, the exercise of that power by the United States for the purposes of navigation alone; second, the exercise of that power by the state for the purpose of reclamation as well as navigation. In both aspects it is beyond question that the acts and conduct of the two governments are referable to the police power.

ID.—DRAINAGE AND RECLAMATION OF LANDS—POLICE POWER.—The drainage and reclamation of lands, apart from any question of navigability, is a legitimate exercise of the police power of the state.

ID.—DAMAGE IN EXECUTION OF POLICE POWER INCOMPENSABLE.—The state of California is not liable in damages in exercising police power in the control of a non-navigable water drain, or watercourse of the Sacramento River, when in so regulating this flow it causes the water to back against lands which otherwise would not have been affected thereby, with the result that those lands are temporarily flooded in whole or in part.

ID.—LEGITIMATE EXERCISE OF POLICE POWER—EMINENT DOMAIN—DAMAGES.—Where the police power is legitimately exercised, uncompensated submission is exacted of the property owner if his property be either damaged, taken, or destroyed; but in the exercise of the power of eminent domain compensated obedience for the taking or damaging of his property is the owner's constitutional right.

ID.—CONSTRUCTION OF CONSTITUTION—DAMAGE TO PROPERTY.—While it is unquestionably true that the addition of the word "damaged" to our constitutional law governing the exercise of the right of eminent domain gives in many instances a right to compensation which did not formerly exist, it did not, touching the exercise of the police power, give a right of action for damages which theretofore were *damnum absque injuria.*

ID.—APPLICABILITY OF DOCTRINE OF DAMNUM ABSQUE INJURIA—TEMPORARY DAMAGE BY FLOOD WATERS.—The doctrine of *damnum absque injuria* is applicable to the prospective temporary consequential damage which it may be found ·will be inflicted upon owners of lands by the future raising of a flood plane, which floods are of temporary duration and character, and which raising the land owners may protect themselves against, and which floods, in the progress of the work of a reclamation district in constructing levees, will be taken care of so that future injury will be avoided, all this under the state's plan of vast magnitude and importance to abate, on the behalf of the whole state, as well as for the benefit of private land owners, including the owners complaining, flood conditions, which, if unchecked, would inevitably lead to the destruction of the navigability of the river in question and to the greater impairment and damage of all the adjacent land.

ID.—WATERCOURSE—SUTTER BASIN.—Whether or not a watercourse exists has to be determined as a matter of law from the evidence in the case; and under all the accepted definitions of a watercourse, Sutter Basin is not one, but a catchment area, principally for the reception of the flood waters of the Sacramento River.

ID.—REPORTS OF CALIFORNIA DEBRIS COMMISSION—JUDICIAL NOTICE.—The reports of the California Debris Commission and of state engineers have been adopted by state statutes, of which courts take judicial notice; and the history of the state, its topographical and general conditions, including notorious facts concerning its rivers, are all matters of judicial cognizance.

ID.—SURFACE WATERS—DEFINITION OF.—Surface waters are those waters from rainfall, melting snows, and springs which seeping or percolating, or vagrantly wandering over the surface of the earth, finally, in obedience to natural law, gather into well-defined channels, where their character as surface waters at once ceases and the waters themselves take on the new character of the body of a defined stream.

ID.—RIGHT TO LEVEE AGAINST FLOOD WATERS—PROVISION FOR SURFACE WATERS.—A reclamation district's right to protect a levee against flood waters cannot be questioned; nor is this right impaired by the fact that these surface waters, as they usually do, form some part of the whole volume of water; and a land owner has performed his full duty in such circumstances if he makes adequate provision for the escape of the surface waters alone.

ID.—INTERFERENCE WITH NATURAL DRAINAGE—CIVIL-LAW RULE.—Notwithstanding the fact that the common-law rules are made the rules of decision in this state, where applicable, the civil-law rule forbidding a lower owner from interfering with the natural drainage of surface waters on to his land from the proprietor whose lands are higher was adopted; but the rule is one that the court has the power to abrogate by adoption of the common-law rule if in its judgment this were the wiser policy to pursue, for, although a rule of property, such a rule is not a vested right in property which may not be taken away without compensation.

APPEAL from a judgment of the Superior Court of Sutter County.   Emmet Seawell, Judge presiding.

The facts are stated in the opinion of the court.

A. C. & H. L. Huston, and Devlin & Devlin, for Appellants.

M. E. Sanborn, W. H. Carlin, Lawrence Schillig, and Arthur C. Coats, for Respondents.

Sullivan & Sullivan and Theo. J. Roche, and C. H. Oatman, *Amici Curiae.*

HENSHAW, J.—Above the confluence of Feather River with Sacramento River lies a vast V-shaped tract of land. Much of this land is swamp and overflowed land of the character contemplated by the Arkansas Act, and title to it passed to the state of California by virtue of that act.   Defendant Reclamation District No. 1500, organized for the purpose of reclaiming the portion of this land within its boundaries, was proceeding with the work of levee construction when, at the instance of these plaintiffs, who for general purposes may be described as owners of land within the same triangle, lying to the north and east of the lands of the Reclamation District, and fronting upon Feather River, the work was stopped by a prohibitory injunction of the trial court.   Still further, a mandatory injunction was decreed, by which the defendant Reclamation District was ordered to destroy the levees which already it had constructed.

The district is the same district, the work the same work, the law of the creation of the district the same law, that were considered in *Reclamation District No. 1500* v. *Superior Court,* 171 Cal. 672, [154 Pac. 845].

The geological and topographical conditions concerning these lands and others similarly situated have been the subject of frequent exposition by this and other courts. For a general review of these facts reference may be made to *Kimball* v. *Reclamation etc. Comm.*, 45 Cal. 344; *Hagar* v. *Yolo County*, 47 Cal. 222; *Dean* v. *Davis*, 51 Cal. 406; *North Bloomfield G. M. Co.* v. *Keyser*, 58 Cal. 315; *People* v. *Gold Run D. & M. Co.*, 66 Cal. 138, [56 Am. Rep. 80, 4 Pac. 1152]; *Lamb* v. *Reclamation Dist.*, 73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625]; *McDaniel* v. *Cummings*, 83 Cal. 515, [8 L. R. A. 575, 23 Pac. 795]; *Gray* v. *McWilliams*, 98 Cal. 157, [35 Am. St. Rep. 163, 21 L. R. A. 593, 32 Pac. 976]; *People* v. *Russ*, 132 Cal. 102, [64 Pac. 111]; *People* v. *Sacramento Drainage Dist.*, 155 Cal. 373, [103 Pac. 207]; *Woodruff* v. *North Bloomfield G. M. Co.*, 18 Fed. 761; *North Bloomfield G. M. Co.* v. *United States*, 88 Fed. 664, [32 C. C. A. 84]; *Hagar* v. *Reclamation Dist.*, 111 U. S. 701, [28 L. Ed. 569, 4 Sup. Ct. Rep. 663]. Summarizing for the convenient consideration of the questions here presented, those conditions are the following: The Sacramento River and its principal tributaries, rising in the Sierra Nevada Mountains, flow with high gradients on to the low-lying lands of the Sacramento Valley. It is declared that anciently this valley was a shallow arm of the sea, and has been reclaimed from the ocean by the soils carried down by the rivers and deposited in it. This valley is still low land, and upon entering it the high gradient of the Sacramento River necessarily drops off to a very low one, with a corresponding arrest of current and carrying capacity. Fed by the heavy rains and the melting snows of the mountains, the onrush of these waters overflows the banks of the river and the waters themselves spread out over vast areas of these low-lying lands. Under the well-known principle of physics that the capacity of water to carry foreign matter in suspension is dependent upon the velocity of the water, and that the instant the velocity is checked the saturated water begins to deposit a portion of the matter held in suspension, the following conditions resulted: By the checking of the flow of the Sacramento River and its tributaries at its banks and edges and by the gradual deposit on top of these banks as the flood waters passed over them in slow-moving sheets, the banks themselves and very consider-

able tracts of land upon either side were raised to a height greater than that of the lower lands beyond.

Thus the rivers themselves came to move along the center of ridges of their own construction. These ridges were highest in immediate proximity to the rivers and sloped gradually downward to the lowest plane of the valley. As the flood waters poured out of the rivers they found their way into these vast areas of lower lands lying on either side of them. These low areas came to be known as "basins," and were bounded upon the river side by the high lands constituting its banks, and upon the opposite side by no well-defined boundary, but only by the natural and gradual rise of the land above the possibility of flooding. So both as to the higher lands near to the river and to the higher lands opposite, their condition was that of susceptibility to occasional and unexpected flooding, depending in any year upon the quantity of water which the river, called upon and unable to carry in its natural bed, cast out over the surrounding country. Thus as to such lands a man's farm might escape flooding for ten years and be flooded on the eleventh. But the lower lying areas were subject to regular recurrent annual floods. We have spoken of these vast areas of low-lying lands as basins. Such is the designation which has been given them by hydraulic engineers. There are several of them. Following down the course of the Sacramento River there is, to the east, first, the Butte Basin, separated from the Sutter Basin by a slight elevation of the land caused by the proximity of the Sutter or Marysville Buttes and by the embankment or ridge built up, as we have heretofore described, by Butte Creek. Next the Sutter Basin, in which are the lands of defendants, subject to overflow both by the waters of the Sacramento River and of the Feather River. Below Sutter Basin and still upon the east side of the river is the American Basin near the junction of the American River with the Sacramento, and finally below this the Sacramento Basin, containing within it the city of Sacramento itself. Upon the west side of the river and opposite Butte Basin and Sutter Basin lies the Colusa Basin, and below that and separated therefrom by Knight's Landing Ridge, itself the ancient high bank of Cache Creek, which subsequently abandoned its former course into the river and turned southward, is Yolo Basin. At all times there flow into these basins

minor streams usually known as creeks, which upon the east of the river commonly have their sources in the foothills of the Sierra Nevada Mountains, and to the west of the river in the Coast Range Mountains. They gather up as well, of course, the surface waters coming from the rainfall upon the lands themselves. But both these elements of supply are insignificant as compared with the vast volumes of water delivered into these basins from the Sacramento River. The general characteristics of all these basins are similar. The river poured its excess waters into them in low places and breaks through the banks, known as sloughs, and over the banks themselves in sheets. These sloughs had well-defined channels as they cut through the higher lands of the river banks, which channels feathered out into nothingness as the sloughs poured their waters into the vast flat area of the basins' low lands. Here and there along the lines of these basins were such sloughs, and always at the lower end was one through which, as the river waters receded until they were below the level of the plane of the submerged area, the waters of these basins were gradually drawn back into the stream. Until the basin itself was filled to the level of the river, it was not unusual for the lower slough, as well as the upper, to be pouring the river waters into the basin, and, upon the other hand, as the waters in the river channel proper receded, it was not unusual for the upper as well as for the lower slough to aid in emptying the waters of the basin back into the mother stream. It is with Sutter Basin and Butte Basin lying immediately above it that we are here concerned. But this brief narration of the general conditions has been made necessary to an understanding of one important phase of this litigation which must be considered, and to the due consideration of which the following additional facts are necessary to be known:

In what has already been said we have dealt with the condition of the Sacramento River in its state of nature before the advent of the white man. That river was and is a navigable stream. It and the San Joaquin River, which joins it in its lower reaches just above their common inflow into Suisun Bay, are the two navigable inland waterways of the state of California. In the preservation and development of these waterways the nation and the state have a common interest and certain incontestable rights. With the discovery of gold

in the upper reaches of all the eastern streams tributary to the Sacramento, as well, indeed, as upon the upper reaches of the Sacramento River proper, hydraulic mining began. As a direct consequence of this, enormous quantities of debris were brought down stream and into the Sacramento River. In addition to this, farming operations, by tearing up the grass roots and loosening the soil, produced an erosion of all these lands theretofore not known. In combination, the beneficial result was merely an increase in the sedimentation of the low-lying swamp and overflowed land. The evil results were many. The immense quantities of detritus brought down by the streams raised enormously the bed of the river, necessarily lessened its depth, aggravated flood conditions, caused the precipitation of large quantities of "slickens" upon the adjacent farming lands to their great injury, shoaled San Pablo Bay, and (so ran the evidence) lessened the depth of water over the bar at the entrance of the Golden Gate. The navigability of the river itself was seriously impaired. These conditions were greatly intensified by the fact that individual works of reclamation and public works by levee districts, drainage districts, and reclamation districts had taken from the normal flood areas immense tracts of land, so that the waters were checked, and by the checking deposited greater quantities of their sediments in suspension, and were forced over lands not theretofore subject to flood, and continuously imperiled leveed lands, as notably the city of Sacramento itself and its surrounding district. The attention of the national government was directed to these conditions. A California Debris Commission was appointed by congressional legislation, and hydraulic mining within the watershed of the river was limited to conditions to be prescribed and permitted by this commission. This statute was upheld in *United States* v. *North Bloomfield G. M. Co.*, 81 Fed. 243, and *North Bloomfield G. M. Co.* v. *United States*, 88 Fed. 664, [32 C. C. A. 84].

In 1893 Congress passed the act creating the California Debris Commission. (4 U. S. Comp. Stats., p. 4604.) The commission gave to the question exhaustive study and research and made its written report, which was approved by the Secretary of War and transmitted to the House of Representatives in June, 1911. Devastating floods had occurred in 1907 and 1908. As soon as the substance of the report was

made known the Governor of the state included in his call for a special session of the legislature the consideration of this great question. This session was called to convene on November 27, 1911, and was directed "to enact laws and pass resolutions concerning the report of the California Debris Commission, . . . and to make an appropriation to pay the expenses of the state engineer in the performance of such additional duties as may be imposed, and creating a reclamation board and defining its powers." The report of the Debris Commission formulated a general plan. It was recognized that modifications of this general plan might be necessary and that the details of it were still to be worked out. The reclamation board created by the legislature was called into existence to do these things. The legislature declared that the problem of navigation and reclamation should be solved in accordance with the plan of the California Debris Commission, with such amendments and modifications as the State Reclamation Board might make. The report of the National California Debris Commission thus and to this extent became a part of the laws of this state. (Stats. [Ex. Sess.] 1911, p. 117.)

A brief consideration of that report here becomes necessary. Primarily charged with the duty of maintaining and improving the navigability of the river, the commission recognized that the solution of this problem was indissolubly and inseparably connected with the control of the flood waters. Says the report: "The interests of navigation, debris control, and flood control in the case of this river are so inseparably connected that it is thought they should be considered under one general project." The report found that in the American and Feather Rivers alone there were at least three hundred million cubic yards of material which must eventually pass down the Sacramento River to tide water, and this without reference to the necessity of deepening the lower courses and channel of the river below Sacramento, which were already greatly impeded by shoal water and sand-bars. It pointed out the utter incapacity of the stream in times of high water to perform any considerable part of the duty of carrying these waters. It discussed at length the geographical and topographical conditions and described with elaboration the "basins" as in outline we have hereinbefore described them. It declared its estimate that a proper con-

trol of the floods would result in the reclamation of about four hundred thousand acres of most fertile land, in addition to protecting three hundred thousand acres more, now reclaimed but always in danger. Reviewing the various suggested methods, the Debris Commission adopted the "by-pass system" as recommended by Engineers Grunsky and Jackson in 1894, with enlargements of the work made desirable by added knowledge of the enormity of the floods.

The by-pass system contemplates, first, the erection of levees along the Sacramento River and its tributaries, the closing up of crevasses and sloughs, so that the highest efficiency may be attained for navigability and as a necessary concomitant for enabling the river to carry debris and aid in the scouring and deepening of its own channel. Artificial spillways or weirs are to be constructed at designated points to take out of the river its excess or flood waters, which are thus immediately brought under control. These waters are to be carried down defined canals or channels in the basins, which are known as "by-passes." Through the ridges, as at Knight's Landing, these will be actual canals dug through the soil. In other places they will be in part surface canals bounded by appropriate levees upon either side. The greatest of these basins, and the one forming the most direct connection with tide water, is the Yolo Basin. Beginning with the Colusa Basin on the west side of the river, the by-pass in this basin leads through a canal in the Knight's Landing Ridge into the Yolo Basin. By this same system the waters of the smaller Butte Basin are led by a by-pass into the larger Sutter Basin by-pass. These accumulated waters are taken into the enlarged Feather River above its junction with the Sacramento, controlled by appropriate weirs and levees and diverted into the Yolo Basin, and by another defined by-pass along Cache Creek are carried into the main stream at the delta lands near its mouth.

It is with this contemplated work, as touching Butte Basin and Sutter Basin, that we are here principally concerned. About thirteen miles above Colusa, upon the east side of the river, there is a break in the bank known as "Moulton's break," through which the flood waters poured into Butte Basin. This break is to be controlled by a weir. Into Butte Basin flows Butte Creek, whose waters, with the river waters of Moulton weir, are to be carried by a by-pass into Sutter

Basin, which, so far as may be observed by the eye, is but a continuation of Butte Basin. Butte Creek discharges its waters into Butte Slough, which, as hereinbefore pointed out, is another break in the eastern bank of the Sacramento River, through which break the waters of the river pour into the basin in flood times, and through which break the waters of Butte Creek are drawn into the Sacramento at its lower stages. Butte Slough is to be cut off, and below it a weir known as the ''Tisdale Weir'' has been constructed, with a connecting by-pass from the river leading into the main by-pass of the Sutter Basin. The water is thus to be carried within the defined boundaries of the Butte Basin by-pass, connecting with the Sutter Basin by-pass, into the Feather and Sacramento Rivers as above outlined. Through Sutter Basin the by-pass or canal is partly on the surface, and the waters are to be carried between controlling levees built on either side. The waters of the connecting Tisdale by-pass are likewise to be confined within levees.

This, for our purposes, sufficiently outlines the proposed work. In 1913 the state of California enacted a most comprehensive statute [Stats. 1913, p. 252] dealing with these matters. It declared that ''The purposes and objects of this act are to carry into effect the plans of the California Debris Commission for the control of the flood waters of the Sacramento and San Joaquin Rivers and their tributaries, and to vest in said reclamation board control and jurisdiction over said plans,'' etc. It gave the reclamation board power to acquire necessary lands by purchase or by condemnation to carry out the great purposes of the act. It forbade the further doing of reclamation work by individuals or districts, excepting under the approval of the board, to the end that such work might not interfere with and might be directed to the aid of the general scheme of reclamation. It provided for compensation to individuals or districts doing work in aid of the general plan. It created a vast drainage district known and designated as ''Sacramento & San Joaquin Drainage District,'' declared it to be a body politic and corporate, and empowered it to levy assessments according to the benefits for the prosecution of the work. All of the lands of plaintiffs, as well as all of the lands of defendants, lie within this district.

Some idea of the magnitude of the undertaking may be gathered when it is stated that the actual flood volume of the Sacramento River is exceeded by only three rivers in the United States—the Mississippi below its confluence with the Missouri, the Ohio River, and the Columbia River; while taking into consideration the relative areas of drainage territory, the flood volume of the Sacramento is fifteen times as great as that of the Mississippi and four times as great as that of either the Ohio or the Columbia.

Progress has been and is being made in the doing of this work. Thus, to accommodate the waters brought down by the Yolo by-pass, equal appropriations and expenditures are being made by the national and state governments to deepen and widen the mouth of the river, the national government superintending the work. Congress at its present session has appropriated five million six hundred thousand dollars in furtherance of the plan, and the act has become law. The city of Sacramento has provided a large fund for the construction of a minor by-pass for its own protection. The canal through Knight's Landing Ridge, allowing the waters of Colusa Basin to flow into Yolo Basin, has been constructed. Other work has been performed by individuals and by districts, as outlined and approved by the reclamation board.

In 1913 Reclamation District No. 1500, defendant herein, was created by a special act of the legislature. (Stats. 1913, p. 130.) The lands of Reclamation District No. 1500 are a part of the lands of Sutter Basin. Their western frontage is on the Sacramento River. The northern boundary is the Tisdale by-pass. The eastern boundary (that is, so far as reclamation works are permitted) is the proposed eastern line of the Sutter by-pass. In the terms of its creation it was declared: ''It shall be the duty of said Reclamation District No. 1500 to construct a levee, forming the south side of Tisdale by-pass, and a portion of the westerly side of the Sutter Basin by-pass, the center line of which levee shall be substantially along the following lines; the same having been approved by the State Reclamation Board March 31, 1913.'' The act creating this reclamation district is a public statute. The construction of the levees is the execution of this public statute. (*Reclamation Dist. No. 1500* v. *Superior Court,* 171 Cal. 672, [154 Pac. 845].) In the performance of this duty and under the direction and approval of the reclamation

board, the defendant had constructed the levee forming the southern boundary of the Tisdale by-pass and was carrying on its work by the construction of the connecting levee, which was to form the western boundary of the Sutter Basin by-pass, when by the injunction of the court it was ordered to cease work and destroy the levees which it had already constructed.

The foregoing statement has failed utterly in its purpose if it has not made it apparent that many different interests are here involved, with their corresponding rights and duties. Thus, there is primarily the interest of the United States in protecting and improving the navigation of the Sacramento River and its navigable tributaries. And as this navigability is inextricably associated with flood conditions, there are the rights of the United States to deal with those flood conditions in aid of navigation. Next there is the same interest upon the part of the state in navigation and the same rights in the matter of flood control. Upon these matters the nation and the state are acting not only in harmony, but, it may be fairly said, under contract. Quite detached from these interests is the further interest of the state alone in the reclamation and bringing into use of its swamp and overflowed land —an interest which is accentuated by the duties which it may have assumed under its acceptance of the Arkansas grant. Next are the interest and the duty of defendant Reclamation District to build the levees, which by the very charter of its organization it was called upon to build, and which by the acceptance of that charter it became in duty bound to build. Again, there is the interest of the owners of the land within the defendant Reclamation District, which is, of course, essentially a private and personal interest. And, finally, as opposed to all of these, is the interest of plaintiffs in preventing, and their right to prevent, an illegal damaging of their property, which asserted illegal damage is the foundation of their action.

In their complaint plaintiffs treat the action of the defendant Reclamation District as being in its nature private and personal and as working a private nuisance to the unlawful injury of their land. Running through the case, however, is the additional assertion that the construction of these levees, with the resultant backing up of the water over parts of their lands, is an unlawful exercise of the right of eminent

domain, damaging their property without compensation first
paid therefor.

And here it becomes necessary to outline the findings of
the trial court upon which it based its judgment.   It was im-
perative, of course, for plaintiffs to recognize that the major
part of the vast volume of water in Sutter Basin was flood
water.   Their efforts, therefore, were directed to establishing
that they were not vagrant flood waters, but were waters un-
der the river's control, and that the river carried these
excess waters through a well-defined waterway or channel
from a point above to a point below.   In this effort they were
successful and the court so found.   The whole judgment
rests upon this finding that Butte Slough and Sutter Basin in
their entirety form a natural watercourse.   From this finding
follows the logical conclusion that defendant has not been
protecting itself against flood waters, but has been illegally
interfering, obstructing, and impeding the waters flowing in
a natural watercourse.   The court itself reasoned and de-
clared that Butte Slough is a well-defined channel extending
from the Sacramento River southerly to the basin; that Butte
Creek empties much of its waters into Butte Slough; that
during flood or high water periods the waters pouring into
Butte Slough from the Sacramento River deflected the waters
of Butte Creek from Butte Slough, and the two combining
flow into Sutter Basin; as the water flows southerly through
the basin it spreads out and forms a vast sheet of water pre-
senting the appearance of an inland sea; Sacramento Slough,
at the lower end of this basin, is a well-defined watercourse
and is the outlet of the basin when the waters of the river fall
sufficiently to permit the drainage of the basin.   Thus the
inlet and outlet of the basin are well-defined watercourses
within the definition of *Miller & Lux* v. *Madera Canal Co.,*
155 Cal. 59, [22 L. R. A. (N. S.) 391, 99 Pac. 502].   Such,
in brief, is the court's review, and it declares that "the one
controlling question in the opinion of the court, and which is
practically decisive in both cases, is whether or not Sutter
Basin is to be regarded as a part of the Sacramento River, a
continuation of Butte Creek during the flood season, or
whether it is to be classified as mere flood waters and brought
within the rule announced in *Lamb* v. *Reclamation District,*
73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625] ; *McDaniel* v.
*Cummings,* 83 Cal. 515, [8 L. R. A. 575, 23 Pac. 795] ; *Gray*

v. *McWilliams*, 98 Cal. 157, [35 Am. St. Rep. 163, 21 L. R. A. 593, 32 Pac. 976], and *Sanguinnetti* v. *Pock,* 136 Cal. 466, [89 Am. St. Rep. 169, 69 Pac. 98]."

The first proposition which demands consideration as applicable to this and numerous other cases which have arisen or may arise goes to the power of the government, here both national and state, to do the projected work, assuming the finding to be true. This consideration deals with navigation alone, though, as has been repeatedly said, in the present instance, the control of flood conditions is essential to the solution of the navigation difficulties. As in this matter the national government is working in harmony with the state government, we may, for convenience, use the word "state." The supreme control of the state over its navigable waters was early declared in *Eldridge* v. *Cowell,* 4 Cal. 80, approved in *United States* v. *Mission Rock Co.,* 189 U. S. 391, [47 L. Ed. 865, 23 Sup. Ct. Rep. 606]. This right of control embraces within it not alone the power to destroy the navigability of certain waters for the benefit of others, but extends in the case of streams to the power to regulate and control the navigable or non-navigable tributaries, as in the debris cases, to the erection of structures along or across the stream, to deepening or changing the channel, to diverting or arresting tributaries; in short, to do anything subserving the great purpose, and, in general, when the act is done, if it does not embrace the actual taking of property, but results merely in some injurious effect upon the property, the property owner must, for the sake of the general welfare, yield uncompensated obedience. But a few of the innumerable cases to this effect need be cited. (*Lamb* v. *Reclamation District,* 73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625]; *Henry Dalton Sons* v. *Oakland,* 168 Cal. 463, [143 Pac. 721]; *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, [57 L. Ed. 1063, 33 Sup. Ct. Rep. 667]; *Lewis Blue Point Oyster Co.* v. *Briggs,* 229 U. S. 82, [Ann. Cas. 1915A, 232, 57 L. Ed. 1083, 33 Sup. Ct. Rep. 679]; *Greenleaf Johnson Lumber Co.* v. *United States,* 204 Fed. 489; *Black River Imp. Co.* v. *La Crosse Booming & T. Co.,* 54 Wis. 659, [41 Am. Rep. 66, 11 N. W. 443]; see, also, Final Report of the National Waterways Committee, 15 Senate Documents, p. 45, 66th Congress, 2d Sess. 1911-12; *People* v. *Russ,* 132 Cal. 102, [64 Pac. 111]; *United States*

*v. Rio Grande Dam etc. Co.,* 174 U. S. 690, [43 L. Ed. 1136, 19 Sup. Ct. Rep. 770].)

This general power, so far as the national government is concerned, is found in the constitutional grant to the United States of the right to regulate commerce with foreign nations and among the states, and the state's power in this regard is limited only by the supervisory control which the paramount authority may exercise over it. This power over navigable waters and over navigation is essentially an attribute of sovereignty, and some of its forms find expression in the exercise of the police power.

When we come to this consideration it is perhaps well to point out and to be borne in mind that as the nation, in matters of navigation, is supreme, and as it has decided upon the method which shall be taken to protect and improve the navigability of the Sacramento River, and as the state is acting in conjunction with the federal government, the question might be treated as an exercise by the federal government alone of its powers over the matter. In such a case, so treated, as we shall see, these plaintiffs would have no grievance which in the federal courts would entitle them to redress. But owing to the inseparable connection between navigation and flood control, and owing to the further fact, often adverted to, that the state is interested in flood control, not alone as affecting navigation, but as affecting its general welfare and benefit in the reclamation of vast domains of land, the exercise of the police power under these circumstances presents a twofold aspect; first, the exercise of that power by the United States for purposes of navigation alone; second, the exercise of that power by the state for purposes of reclamation as well as navigation. In both aspects it is beyond question that the acts and conduct of the two governments are referable to the police power. Of this the decisions themselves remove all doubt. Though, of course, whether in any given instance, as in this instance, the proper limits of the police power have been exceeded, with the result that unlawful confiscation or damage is worked, remains still a question for consideration. But upon the general proposition that the police power is exercised in improving the navigability of a stream, it is sufficient to refer in our own state to *Green* v. *Swift,* 47 Cal. 536; *Hoagland* v. *City of Sacramento,* 52 Cal. 142; *Green* v. *State,* 73 Cal. 29, [11 Pac. 602, 14 Pac.

610]; while so far as the, national government is concerned, it is sufficient to direct attention to *Jackson* v. *United States,* 230 U. S. 1, [57 L. Ed. 1363, 33 Sup. Ct. Rep. 1011], and *Cubbins* v. *Mississippi River Comm.,* 204 Fed. 299. In both of these cases the supreme court of the United States was dealing with asserted damages inflicted by the levee system of the Mississippi River, whose conditions are in all vital respects similar to those of the Sacramento River.

Upon the second proposition, viz., that the drainage and reclamation of lands, apart from any question of navigability, is a legitimate exercise of the police power of a state, it is sufficient, without quotation, to refer to *Hagar* v. *Board of Supervisors,* 47 Cal. 222; *Lamb* v. *Reclamation Dist.,* 73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625]; *People ex rel. Chapman* v. *Sacramento D. Dist.,* 155 Cal. 373, [103 Pac. 207]; *Laguna etc. Dist.* v. *Martin Co.,* 144 Cal. 209, [77 Pac. 933]; *Hagar* v. *Reclamation Dist.,* 111 U. S. 701, [28 L. Ed. 569, 4 Sup. Ct. Rep. 663]; *Barbier* v. *Connolly,* 113 U. S. 27, [28 L. Ed. 923, 5 Sup. Ct. Rep. 357]; *Chicago & Alton R. R. Co.* v. *Tranbarger,* 238 U. S. 67, [59 L. Ed. 1204, 35 Sup. Ct. Rep. 678].

Still, treating the question in its governmental aspect as being the state's exercise of its police power, we have reached the point in our discussion where it can be declared as beyond question that the general act under which this work was being done is referable to the police power, and therefore valid, and as a necessary corollary of this it follows that if in the doing of this particular piece of work the limits of the police power are not transgressed, the plaintiffs have no just cause of complaint. It is too well recognized to need the citation of authority that in its legitimate exercise the police power often works not only damage to property but destruction of property. Injury to property can and often does result from the demolition of buildings to prevent the spread of conflagration, from the abandonment of an existing highway, from the enforced necessity of improving property in particular ways to conform to police regulations and requirements. So full are the books of these instances that it is superfluous to cite authorities upon the proposition. And equally well settled and understood is the law that in the exercise of this same power property may in some, and indeed in many, instances be utterly destroyed. The destruc-

tion of buildings, of diseased animals, of rotten fruit, of infected trees, are cases that at once come to mind as applicable to both personalty and realty. Always the question in each case is whether the particular act complained of is without the legitimate purview and scope of the police power. If it be, then the complainant is entitled to injunctive relief or to compensation. If it be not, then it matters not what may be his loss, it is *damnum absque injuria.*

Our present question then is: Is the state of California liable in damages in exercising the police power in the control of a non-navigable water drain or watercourse of the Sacramento River when in so regulating this flow it causes the water to back against lands which otherwise would not have been affected thereby, with the result that those lands are temporarily flooded in whole or in part? Temporarily flooded, we repeat, because this case presents none of the features of *Pumpelly* v. *Green Bay Co.,* 13 Wall. 166, [20 L. Ed. 557], where a public improvement—a dam—in navigable water, made under local statutory authority, permanently flooded the plaintiff's land and "destroyed its use for every purpose," and where the supreme court, declaring the case to be an extreme one, held that this was a taking within the meaning of the constitution, for which the owner was entitled to compensation. In the case at bar it is to be observed that the flooding, occasioned only by reason of the diminution of the area of the Sutter Basin, will in the first place be but temporary and will end when the reclamation works in the Sutter Basin are completed, and, in the second place, may be protected against by the levee district, in which most of plaintiff's lands are situated, and by the other property owners by a back levee, or by the construction of the eastern levee of the Sutter Basin by-pass, for their proportionate expense in building which their lands would be liable under assessment by the Sacramento & San Joaquin Drainage District; while, upon the other hand, the builders would be entitled to compensation from that district for any excess expenditure over their due proportion which they might incur in the construction of the work.

But that work of the character here enjoined is work done under a legitimate exercise of the police power, and that the damages which will result from it, such as are here contended for, are damages for which the owner of the land is not en-

titled to compensation, is, without the slightest conflict in them, established by all authorities, federal and state, at least where the constitutional provision forbids merely a taking. Our own cases, such as *Green* v. *Swift*, 47 Cal. 536, and the cases of the supreme court of the United States, such as the Jackson case and the Cubbins case, *supra*, are the only references which need be made to support this incontestable declaration.

Such being the case, the final query upon this subject matter is this: Has the amended provision in our constitution, providing that private property may neither be taken nor damaged for public use without the prepayment of compensation, limited and abridged the exercise of the police power of the state in its efforts directed to the abatement of this great public nuisance? Has it limited and abridged the exercise of the police power, which, by an adopted definition, this court has declared to be in its final analysis "the power to govern?" (*Western Indemnity Co.* v. *Pillsbury*, 170 Cal. 686, 694, [151 Pac. 398, 10 N. C. C. A. 1].) Much has been said by the courts about the broad, the obvious distinction between the police power and the power of eminent domain. We will not unnecessarily enmesh ourselves in the intricacies of exact definition. Indeed, we think that, so far as these powers meet and overlap, no precise definition can be given. But this much is incontestably true: Where the police power is legitimately exercised, uncompensated submission is exacted of the property owner if his property be either damaged, taken, or destroyed. In the exercise of the power of eminent domain, compensated obedience for the taking or damaging of his property is the owner's constitutional right.

The problems do not arise from any similarity in the nature of the powers themselves. They arise in each case from the difficulty of determining whether or not the asserted exercise of the police power is but a disguise for evading the private owner's rights, with the result that his property is taken or damaged without compensation in a case where compensation is called for. But while it is unquestionably true that the addition of the word "damaged" to our constitutional law governing the exercise of the right of eminent domain gives in many instances a right to compensation which did not formerly exist, it did not, touching the exercise of the police power, give a right of action for damages which theretofore

were *damnum absque injuria.* The slightest reflection, we think, must establish the soundness of this doctrine, for if it be not so, then must the law creating our railroad commission, which is a law enacted under the sanction of the police power (*Pacific Telephone etc. Co.* v. *Eshleman,* 166 Cal. 640, [Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652, 137 Pac. 1119]), forbid that commission from making any judgment necessitating the expenditure of money by these corporations, excepting after compensation made for the damage worked to property; for that a taking or damage is worked is universally conceded, and the sole ground upon which the denial of compensation is placed is that the judgment of the commission is but a legitimate enforcement of the police power. The same is true of the Employers' Liability and the Workmen's Compensation Act. In every instance of an award where the employer is not in fault there is a manifest taking of property from the employer without compensation, and support for such decrees is rested solely upon the police power. (*Great Western Power Co.* v. *Pillsbury,* 170 Cal. 180, [149 Pac. 35, 9 N. C. C. A. 466]; *Western Metal Supply Co.* v. *Pillsbury,* 172 Cal. 407, [156 Pac. 491].) It cannot be said that the operation of these later laws are legitimate exercises of the police power and at the same time be said that the exercise of a law such as this, even though it work consequential damage, is no longer, as heretofore it has always been, such a legitimate exercise.

But we are here particularly concerned with that phase of the police power which is directed to the abatement of a nuisance in aid of navigation and in the reclamation of vast tracts of state land. Where similar questions have arisen in states containing the same constitutional provision as does our own, the courts have found no hesitation in declaring that the principle of *damnum absque injuria* has not been modified by the provision added to the constitutional law of eminent domain touching the damaging of private property. The general rule, so far as the federal decisions are concerned, has been sufficiently declared. It may be summed up in the following language from 5 Encyclopedia of the United States Supreme Court Reports, page 612: "Private interests are subservient to the right of the state in the exercise of the police power to carry out a system of drainage designed to benefit and protect the public health from the injuries arising from

swamp and overflowed lands, and, except where property is taken for which compensation must be paid, such interests must give way to any general scheme for the reclamation or improvement of such lands. The drainage of large bodies of swamp and overflowed lands, even though done for the purpose of reclaiming them for agricultural purposes, and not for the purpose of promoting the public health, is a public purpose and a proper exercise of the police power of the state, and damages resulting to property through the carrying out of such a scheme are *damnum absque injuria* and do not constitute a taking of property under the fourteenth amendment.'' We may briefly consider some of the cases arising under constitutions identical with our own. The constitution of Illinois contains the same provision found in ours. In *Chicago etc. Ry. Co.* v. *People,* 212 Ill. 103, [72 N. E. 219], drainage commissioners appointed pursuant to the law sought by mandate to compel the railway company to construct, enlarge, and deepen and widen a waterway over and across its own right of way, and to construct a new railroad bridge over this deepened waterway. The railroad company contested upon the ground that the demand was not within the legitimate exercise of the police power, but, to the contrary, that its enforcement would be a taking and damaging of the railroad property in the necessary expenditure of money to be made, without compensation. The supreme court of Illinois declared: ''Uncompensated obedience to a regulation enacted for the public safety under the police power of the state is not a taking or damaging without just compensation of private property, or of private property affected with a public interest,'' and mandate issued accordingly. In the same case (200 U. S. 561, [4 Ann. Cas. 1175, 50 L. Ed. 596, 26 Sup. Ct. Rep. 341]) the supreme court of the United States declared, upholding the judgment of the supreme court of the state: ''We hold that the police power of a state embraces regulations designed to promote public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety. . . . Compensation has never been a condition of its exercise, even when attendant with inconvenience or peculiar loss, as each member of a community is presumed to be benefited by that which promotes the general welfare. . . . But the clause prohibiting the taking of private property without compensation

is not intended as a limitation of the exercise of those police powers which are necessary to the tranquillity of every well-ordered community, nor of that general power over private property which is necessary for the orderly existence of all governments." In *Pennsylvania R. Co.* v. *Marchant,* 119 Pa. St. 541, [4 Am. St. Rep. 659, 13 Atl. 690], the constitution provided that in the taking of private property for public use there should be made "just compensation for property taken, injured, or destroyed by the destruction or enlargement of their works, highways, or improvements, which compensation shall be paid or secured before such taking, injury, or destruction." It was held there that the meaning of the constitution was "to give a remedy merely for legal wrongs and not for such injuries as were *damnum absque injuria.*" This case, carried to the supreme court of the United States, was affirmed in *Marchant* v. *Pennsylvania R. Co.,* 153 U. S. 380, [38 L. Ed. 751, 14 Sup. Ct. Rep. 894]. The Georgia constitution, containing the same provision, was construed in *Peel* v. *City of Atlanta,* 85 Ga. 138, [8 L. R. A. 787, 11 S. E. 582]. The city owning a lot of land, opened a public street upon it. The plaintiff complained that her land was damaged because the result was to bound it on three sides by three public streets. There were other special elements of damage alleged. After a review of the law it was held that the asserted damage, though actual, was *damnum absque injuria.* To the same effect is *Austin* v. *Augusta T. Ry. Co.,* 108 Ga. 671, [47 L. R. A. 755, 34 S. E. 852]. *Chicago & Alton R. Co.* v. *Tranbarger,* 238 U. S. 67, [59 L. Ed. 1204, 35 Sup. Ct. Rep. 678], presented this same question under a different state of facts. The case arose under a Missouri statute. In that state the rule of decision permits a proprietor to levee or make an embankment against surface waters. The railroad company had done this thing, with the result that the surface waters thus checked and impounded interfered with the use of Tranbarger's land. The state of Missouri passed a statute making it compulsory upon railroad companies to build suitable ditches, drains, and culverts through their embankments, and providing penalties for a failure to construct them. Tranbarger sued the railroad company to enforce such a penalty based upon the injury which his land had sustained. It was argued by the railroad company that at the time and after the construction of their embankment it was within their legal right to main-

tain it as it was maintained, without regard to the fact that it arrested the flow of surface water; that to force them to make cuts and culverts through their embankments without compensation was a taking and damaging of their property in violation of the constitution. So far as the taking or damaging was concerned, it was clear and undeniable. It is declared by the supreme court of the United States to be a satisfactory answer to all these objections that "the act under consideration is a legitimate exercise of the police power, and not in any proper sense a taking of the property of the plaintiff in error." In the state of Washington, where the constitutional provision is the same as ours, it was held that the operation of a railroad gave no right of action to the owner of near-by property, though his property was injury thereby, such consequential injuries being *damnum absque injuria.* This was in answer to the contention rested upon the eminent domain provision. The authorities are reviewed and the conclusion is expressed that "we are of the opinion that this eminent domain constitutional provision does not change or lessen the force of the doctrine of *damnum absque injuria.*" (*Taylor* v. *Chicago, M. & St. P. Ry. Co.,* 85 Wash. 592, L. R. A. 1915E, 634, [148 Pac. 887].) In our own state the recent case of *Ex parte Hadacheck,* 165 Cal. 416, [L. R. A. 1916B, 1248, 132 Pac. 584], held that restricting and forbidding the carrying on of a lawful operation within a prescribed territory was valid as an exercise of the police power whose exercise "is not limited by the fact that the value of investments made in the business prior to any legislative action will be greatly diminished," and this conclusion could have been reached only after the determination that this real damage was *damnum absque injuria.* Under writ of error the supreme court of the United States sustained this view, declaring (*Hadacheck* v. *Sebastian,* 239 U. S. 410, [Ann. Cas. 1917B, 927, 60 L. Ed. 348, 36 Sup. Ct. Rep. 145]): "It is to be remembered that we are dealing with one of the most essential powers of government, one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily. A vested interest cannot be asserted against it because of conditions once obtaining. (*Chicago & Alton R.* v. *Tranbarger,* 238 U. S. 67, 68, [59 L. Ed. 1204, 35 Sup. Ct. Rep. 678].) To so hold would preclude development

and fix a city forever in its primitive conditions.   There must be progress, and if in its march private interests are in the way, they must yield to the good of the community.'' Closely paralleling the present case in certain of its essential features is the Arkansas case of *McCoy* v. *Plum Bayou etc. Dist.*, 95 Ark. 345, [29 L. R. A. (N. S.) 396, 129 S. W. 1099]. The case involved the reclamation of a flood basin of the Arkansas River.   The reclamation levee was built across certain sloughs through which flood waters from the river found their way after escaping from its banks, and through which the waters returned to the river as it receded.   The action was brought, after construction of the levee, to recover for the damages arising from the fact that. the flood plane outside of the levee district was raised by the building of the levee, and it was established that the water rose higher afterward than it ever did before.   The supreme court of Arkansas gave deep consideration to the question, with reference to numerous authorities including our own case of *Lamb* v. *Reclamation Dist.*, 73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625]. After this review the court concluded that ''the defendant could rightfully construct the levee in the manner described without liability to the plaintiff for damages.   It is insisted, however, that a distinction should be made because of the provision of our constitution that 'private property shall not be taken, appropriated or damaged for public use without just compensation therefor' (Const. 1874, art. II, sec. 22).   In reaching the conclusion above announced we are not unmindful of the constitutional provision, but where no right has been violated there is no injury for which the liability affords compensation and it is a case of an injury without damages.'' The supreme court of Mississippi, under a constitutional provision like ours, where the acts complained of were the acts of its levee commissioners in controlling the waters of the river whose name the state bears, has held that the land owner is not entitled to compensation because the construction of the levee renders the land between it and the river worthless for agriculture and necessitates the removal of houses on to the protected side of the levees.   (*Richardson* v. *Levee Commrs.*, 68 Miss. 539, [9 South. 351].)

Nothing in any of our decisions in the slightest militates against this conclusion. *Reardon* v. *San Francisco*, 66 Cal. 492, [56 Am. Rep. 109, 6 Pac. 317], contains a discussion of

the meaning of the word "damage" as newly placed in the constitution. The holding was that it applied to *special* consequential damages which the owner of adjoining property received over and above the common injury to other abutters on the street or the general public, by reason of a street improvement. It based its conclusion largely upon the views of the supreme court of Georgia, reference to which has hereinbefore been made. No difficulty arises over this case, which by its very language is limited to special damage occasioned to particular property which is not a common damage to all abutting property. Upon the other hand, in *De Baker* v. *Southern California Ry. Co.,* 106 Cal. 257, [48 Am. St. Rep. 237, 39 Pac. 610], this court in Bank, referring to the contention that because of the modification of our constitution, the doctrine of *Green* v. *Swift,* 47 Cal. 536, and *Green* v. *State,* 73 Cal. 29, [11 Pac. 602, 14 Pac. 610], and *Lamb* v. *Reclamation District,* 73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625], were no longer the law, passed it by with the statement merely that "it is possible this may be true." But here and now, therefore, for the first time is the question presented, and for the reasons above given, we hold that the doctrine of *damnum absque injuria* is applicable to the prospective temporary consequential damage which it may be found will be inflicted upon the plaintiffs' lands by the future raising of a flood plane, which floods are of temporary duration and character, which raising the plaintiffs may protect themselves against, and which floods, in the progress of the work, will be taken care of so that future injury will be avoided, all this under the state's plan of vast magnitude and importance to abate, on behalf of the whole state, as well as for the benefit of private land owners, including these plaintiffs, flood conditions, which, if unchecked, would inevitably lead to the destruction of the navigability of the river and to the greater impairment and damage of all the adjacent land. Further than this it is not necessary here to go.

The second branch of this case which is proper for review goes to the right of the defendant, as an organized irrigation district, to do this work for its own protection, without regard to its public character as part of the proposed work of the nation and the state. This necessitates a consideration of the attack made by appellant upon two of the vital findings of the court; the first being the finding that Sutter Basin is a

natural watercourse within the meaning and definition of the law, and that the defendant is illegally obstructing it; the second being that these obstructions result in an illegal forcing back on the lands of plaintiffs of surface waters which they are entitled to have flow on without impediment. Touching the first finding, the topographical and hydrographical conditions have been pointed out with sufficient exactness. All of the waters which Sutter Basin contains are emptied into the river when flood conditions have ceased, so that one may drive along and across the whole basin. A depth of water of one foot along the line of greatest depression means an expanse of water a mile on either side, and every addition to the depth of the water proportionately extends its area. In times of high water it is but a geographical continuation of the upper Butte Basin, the waters of which from Moulton break, from Butte Creek, and from minor sloughs and drainage ditches move down, covering a correspondingly vast area. Butte Slough, as has been pointed out, has a defined channel only as it cuts through the high lands constituting the east bank of the Sacramento River. Sacramento Slough at the lower end has a defined channel of identically the same character. The waters of Tisdale weir pour into this basin as into a lake. The waters of Feather River for seven or eight miles above its junction with the Sacramento likewise pour into this basin. Not inaptly the trial court in its opinion described it under these conditions as an ''inland sea,'' and yet in its findings declared it to be a watercourse of the Sacramento River. In support of this finding respondents' principal reliance is placed upon the case of *Miller & Lux* v. *Madera Canal etc. Co.*, 155 Cal. 59, [22 L. R. A. (N. S.) 391, 99 Pac. 502]. All that was decided in that case touching this matter was that when there are natural and accustomed limits to the channel of a river, though the channel for the dry season may be more limited and that for the wet season more extended, and when usually recurring floods flow in one continuous stream in the accustomed enlarged channel and are naturally confined thereto, such regularly recurring flood waters are deemed to be a part of the ordinary flow of the stream. It would seem superfluous to elaborate upon the distinctions between such a condition as this and that shown here to exist. There are sloughs, principally in the lower reaches of the river, which are properly channels, and

they are the more frequent near the low-lying lands in the delta regions at and about the confluence of the Sacramento and the San Joaquin. There are Steamboat Slough, and Sixteen Mile Slough, and Three Mile Slough, and Montezuma Slough, and many others which are distinctively waterways. Such a slough is spoken of in *Island Reclamation Dist.* v. *Floribel Alfalfa Syndicate,* 167 Cal. 467, [140 Pac. 4]. But, on the other hand, Butte Slough in this case is precisely of the character of Wilkins Slough, discussed in *Lamb* v. *Reclamation Dist.,* 73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625], the closing of which slough was there complained of. Touching Wilkins Slough it was there said: "It is not a channel or fork continuously carrying a large part or any part of the waters of the Sacramento River. It carries no water at all except in times of flood," and it was declared not to be a watercourse. Whether or not a watercourse exists is "to be determined as matter of law from the evidence in the case." (*Sanguinnetti* v. *Pock,* 136 Cal. 466, [89 Am. St. Rep. 169, 69 Pac. 98].) Under all of the accepted definitions of a watercourse, our own as well as those from other states, Sutter Basin is not a watercourse but a catchment area, principally for the reception of the flood waters of the Sacramento River. "The whole space between the foothills and a river is not to be called the channel because it sometimes overflows." (*Kansas City Ry. Co.* v. *Smith,* 72 Miss. 677, [48 Am. St. Rep. 579, 27 L. R. A. 762, 17 South. 78]; *Gibbs* v. *Williams,* 25 Kan. 214, [37 Am. Rep. 241]; *Sanguinnetti* v. *Pock,* 136 Cal. 466, [89 Am. St. Rep. 169, 69 Pac. 98]; *Lamb* v. *Reclamation District,* 73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625]; *Los Angeles Cem. Assn.* v. *City of Los Angeles,* 103 Cal. 461, [37 Pac. 375].) Moreover, the reports of the California Debris Commission and of state engineers have been adopted by state statutes. This court takes judicial notice of them. (*Jackson* v. *United States,* 230 U. S. 1, [57 L. Ed. 1363, 33 Sup. Ct. Rep. 1011].) In addition to this, the history of the state, its topographical and its general conditions, including notorious facts concerning its rivers, are all matters of judicial cognizance. (*People* v. *Truckee Lumber Co.,* 116 Cal. 401, [58 Am. St. Rep. 183, 39 L. R. A. 581, 48 Pac. 374]; *Olive* v. *State of Alabama,* 86 Ala. 88, [5 South. 653, 4 L. R. A. 39, and note]; Chamberlayne on Evidence, sec. 74.) This evidence, within our

judicial knowledge,. absolutely negatives the concept of a watercourse. The same contention was presented to the supreme court in the case of the Mississippi River, whose flood conditions have been recognized and declared to be similar to those of the Sacramento (*Lamb* v. *Reclamation District, supra*), and the supreme court of the United States declared the contention untenable upon its own judicial knowledge. (*Cubbins* v. *Mississippi River Commission*, 241 U. S. 351, [60 L. Ed. 1041, 36 Sup. Ct. Rep. 671].) Respondents' last argument in support of this finding, that by an inspection of the premises which the court made it received evidence which is not embodied in the transcript on appeal, and which must be considered as sufficient to support the finding, upon the authority of *Hatton* v. *Gregg*, 4 Cal. App. 537, [88 Pac. 592], is completely disposed of, without the necessity for considering any other matters, by the judge's own statement, as follows: "So far as receiving any evidence, I cannot say that I did. I simply received a brief impression of the country." Such a view, taken for the purpose of gaining a better understanding of the evidence given will not, of course, be held to be the taking of independent evidence from which such a finding as this may draw support.

Independently of the findings establishing a natural watercourse, the court further declared that defendants' levee work impeded the natural flow of surface waters and would force them back on plaintiffs' lands. Herein it stated that there are "numerous creeks and watercourses . . . which gather up, and from time immemorial have gathered up, the surface waters which flow upon the above-described lands of plaintiffs and other lands in the vicinity thereof in said county of Sutter, . . . and which creeks and watercourses carry and deposit such waters naturally into said Sutter Basin, . . . and at times of heavy rainfall in every year carry not less than two thousand four hundred second-feet of water"; further, that the by-pass or channel east of the levee of defendant will not be "sufficient to carry off or discharge all or any material portion of the surface waters that would otherwise flow to and upon the lands within said district." This is explained by an elaboration of the finding, which declares that the completion of defendants' levee work will result in a diversion of the waters of Sutter Basin, "and the diverted waters will at all seasons of high water be raised to such an

extent as to form a 'Water Cushion,' which will effectually impede and obstruct the natural flow and prevent the natural discharge of all waters mentioned, all of which waters are surface waters, and will cause the same to overflow and leave their natural courses and to spread out over and inundate the land of plaintiffs." And, finally, that the elevation of the flood plane will not be caused entirely by flood waters; "on the contrary, it will be caused by the obstruction of said Sutter Basin, which is a natural watercourse, and the waters so obstructed will be the combination of the natural flow of Butte Creek, or surface waters from the watershed lying between Feather River and the Sutter Basin and of flood waters."

Surface waters, it is well understood, are those waters from rainfall, from melting snows, from springs, which seeping or percolating, or vagrantly wandering over the surface of the earth, finally, in obedience to natural law, gather into well-defined channels, where their character as surface waters at once ceases and the waters themselves take on the new character of the body of a defined stream. (Gould on Waters, 2d ed., sec. 265; Farnham on Water and Water Rights, sec. 878; *Schaefer* v. *Marthaler*, 34 Minn. 487, [57 Am. Rep. 73, 26 N. W. 727]; *Rait* v. *Furrow*, 74 Kan. 101, [10 Ann. Cas. 1044, 6 L. R. A. (N. S.) 157, 85 Pac. 934].) We will not pause here to discuss appellants' contention that these findings from which we have quoted are self-destructive, in that they include in and define as surface waters those flowing in what the court declares to be natural, well-defined watercourses. In fact, it is established, and it is beyond question of doubt, that some of these are natural creeks within well-defined channels, which gather up the rainfall in so far as their capacities permit. In times of heavy rains their channels are wholly inadequate for this purpose, and the waters spread out, precisely as they do in the case of the larger rivers. In some instances artificial drains have been constructed communicating with these natural channels, in others the natural channels themselves have been enlarged. But, passing on to the main question, the court does not mean to find that this small amount of two thousand four hundred feet of water in comparison to the enormous flood flow, aggregating over two hundred and twenty thousand feet, is or could be so obstructed by the works of defendant that ade-

quate drainage has not been left for the passage of the surface water alone. Its finding in this regard is explained by the language which we have already quoted, and which means that the curtailment of the flood basin creates out of these flood waters a "Water Cushion" which will arrest the flow of the surface water and cause it to back up and overflow parts of plaintiffs' lands. But the defendant's right to protect and levee against flood waters cannot be questioned. Nor is this right impaired by the fact that these surface waters, as they usually do, form some part of the whole volume of water. A land owner has performed his full duty under such circumstances if he make adequate provision for the escape of the surface waters alone. In this aspect the present case is precisely that of *Sanguinnetti* v. *Pock,* 136 Cal. 466, [89 Am. St. Rep. 179, 69 Pac. 98]. There is no finding in this case that the channel which is left is insufficient to take care of the surface waters were it not for the flood waters, and *Sanguinnetti* v. *Pock* is full authority for the statement that if such an adequate channel is left, defendant's right to construct its levee against flood waters is not impaired by the consequences which may result from a commingling of the flood and the surface waters.

*Sanguinnetti* v. *Pock* is determinative of the question, but there is another consideration which may with propriety be adverted to. *Ogburn* v. *Connor,* 46 Cal. 346, [13 Am. Rep. 213], declared for the civil-law rule, forbidding a lower owner from interfering with the natural drainage of surface waters on to his land from the proprietor whose lands were higher. It was an adoption of the civil-law rule (*Walker* v. *Southern Pac. R. R. Co.,* 165 U. S. 593, [41 L. Ed. 637, 17 Sup. Ct. Rep. 421]; *Cass* v. *Dicks,* 14 Wash. 75, [53 Am. St. Rep. 859, 44 Pac. 113]), notwithstanding the fact that the common-law rules are made the rules of decision in this state, where applicable. (Stats. 1850, p. 219; Pol. Code, sec. 4468.) And this is made quite apparent from the later case of *McDaniels* v. *Cummings,* 83 Cal. 515, [8 L. R. A. 575, 23 Pac. 795].) But in the last-mentioned case it is added that a rule of property has grown out of the earlier decision and, on the principle of *stare decisis,* that decision will be adhered to. But it is a rule which this court would have the power to abrogate by the adoption of the common-law rule if in its judgment this were the wiser policy to pursue. (*Jones* v.

*California Devel. Co.*, 173 Cal. 565, [L. R. A. 1917C, 1021, 160 Pac. 823].) It is, of course, a rule which the legislature itself could change. For a rule of property is not a vested right in property which may not be taken away without compensation. This case, then, though in different form, presents the features of the Tranbarger case (238 U. S. 68, [59 L. Ed. 1204, 35 Sup. Ct. Rep. 678].) The Missouri constitutional provision, as has been pointed out, is the same as ours. The rule as to surface waters was the common-law rule authorizing the land owner to protect himself against them. It was as much a rule of property as the civil-law rule in this state is a rule of property. By statutory enactment the state of Missouri modified the rule as to the railroad company, and compelled it under penalties and at great personal expense to make provision for cuts, drains, and culverts to allow the escape of surface water from the land of Tranbarger upon which, before that law, it had, so far as the conduct of the railroad company was concerned, legally stood. One of the contentions of the railroad company before the supreme court of the United States was that this rule of property gave it a vested right, of which it was not only divested by the statute in question, but in the divestiture there was imposed upon it great expense and a taking of property without process of law. The supreme court of the United States made answer as follows: "The previous immunity from responsibility for such injury was nothing more than a general rule of law, which was not in terms or by necessary intendment imported into the contract. For just as no person has a vested right in any general rule of law or policy of legislation entitling him to insist that it shall remain unchanged for his benefit (*Munn* v. *Illinois*, 94 U. S. 113, 134, [24 L. Ed. 77]; *Hurtado* v. *California*, 110 U. S. 516, 532, [28 L. Ed. 232, 4 Sup. Ct. Rep. 111]; *Buttfield* v. *Stranahan*, 192 U. S. 470, 495, [48 L. Ed. 525, 24 Sup. Ct. Rep. 349]; *Martin* v. *Pittsburg etc. Co.*, 203 U. S. 284, 294, [8 Ann. Cas. 87, 51 L. Ed. 184, 27 Sup. Ct. Rep. 100]), so an immunity from a change of the general rules of law will not ordinarily be implied as an unexpressed term of an express contract. (See *Gross* v. *United States Mortgage Co.*, 108 U. S. 477, 488, [27 L. Ed. 795, 2 Sup. Ct. Rep. 940]; *Pennsylvania R. R. Co.* v. *Miller*, 132 U. S. 75, 83, [33 L. Ed. 267, 10 Sup. Ct. Rep. 34].) "

Certainly with this authority before us, an argument of no little weight could be advanced to the effect that the state of California, in making it the duty of this Reclamation District to construct these levees in furtherance of its own work did, as did the state of Missouri; that is to say, it set aside the rule of law as to surface waters so far as that rule would operate to impede the great purpose which it had in view.

But we need not pursue this suggestion further, nor base our decision upon it, since what has been said and shown besides and beyond this argument affords complete justification for the action of defendants. And herein we may conclude with the language of the supreme court in *Jackson* v. *United States*, 230 U. S. 1, [57 L. Ed. 1363, 33 Sup. Ct. Rep. 1011], where, to a complainant under like circumstances, it made answer, that even though his land, because of the proposed work, would be subject to occasional overflow, though never overflowed before, "there would be no right on the part of an individual to insist that primitive conditions be suffered to remain, and thus all progress and development to be rendered impossible"; and that the untenable position of plaintiffs is "that they have the right to stereotype the conditions existing at the time they built their levees to the extent of preventing anyone from subsequently exerting his right to build a levee to protect his land."

It is manifest that this case, so far as evidentiary matters are concerned, was most thoroughly tried in the court below. This court, however, is unable to make findings of fact. If, on the going down of the *remittitur* it shall appear that no further material evidence is to be presented, the trial court will make its findings in accordance with the legal views here expressed and render its judgment accordingly.

The judgment is reversed and the cause remanded.

Shaw, J., Lorigan, J., Melvin, J., Sloss, J., Lawlor, J., and Angellotti, C. J., concurred.

Rehearing denied.